1  JOHN N. TEDFORD, IV (State Bar No. 205537)
   *jtedford@DanningGill.com*
2  AARON E. DE LEEST (State Bar No. 216832)
   *adeleest@DanningGill.com*
3  DANNING, GILL, ISRAEL & KRASNOFF, LLP
   1901 Avenue of the Stars, Suite 450
4  Los Angeles, California 90067-6006
   Telephone: (310) 277-0077
5  Facsimile: (310) 277-5735

6  Proposed attorneys for Debtor and Debtor in
   Possession Better Nutritionals, LLC
7

8

9               **UNITED STATES BANKRUPTCY COURT**

10              **CENTRAL DISTRICT OF CALIFORNIA**

11                    **RIVERSIDE DIVISION**

12

13  In re                              Case No. 6:22-bk-14723-RB

14  BETTER NUTRITIONALS, LLC,          Chapter 11

15            Debtor.                  **DECLARATION OF SHARON
                                       HOFFMAN IN SUPPORT OF FIRST DAY
16                                     MOTIONS**

17                                     Date:    [*See notice of hearing*]
                                       Time:    [*See notice of hearing*]
18                                     Place:   [*See notice of hearing*]

19

20         I, Sharon Hoffman, declare and state as follows:

21         1.     I am a co-founder of, and am the Manager and Chief Executive Officer of, Better

22  Nutritionals, LLC ("**Better Nutritionals**" or the "**Company**").

23         2.     On December 20, 2022 (the "**Petition Date**"), the Company filed a voluntary

24  petition for relief under chapter 11 of title 11 of the United States Code (the "**Code**").  The chapter

25  11 case (the "**Case**") is pending in the Riverside Division of the United States Bankruptcy Court

26  for the Central District of California (the "**Court**").

27         3.     To try to help ease its transition into operation as a debtor in possession, the

28  Company has filed motions seeking various types of "first-day" relief (the "**First Day Motions**").

1  This declaration is submitted to offer the Court and parties in interest background on the Company

2  and the circumstances leading to the commencement of the Case, and provide an evidentiary basis

3  for the relief requested in the First Day Motions.

4      4.    In the First Day Motions, Better Nutritionals is seeking the following types of relief:

5      (a)    an extension of time, to January 20, 2023, for the Company to file its

6  schedules, statement of financial affairs, and related documents;

7      (b)    an order limiting the number of parties that must be served with most notices

8  to be filed and served in the Case;

9      (c)    authority to pay prepetition wages, salaries and commissions within the

10  limits established by section 507 of the Code (up to $15,150 per employee);

11      (d)    an order prohibiting utilities from discontinuing services; and

12      (e)    authority to use cash collateral.

13      5.    I am generally familiar with the Company's day-to-day operations, business,

14  financial affairs, and books and records.  As Manager and CEO, I manage and oversee all aspects

15  of Better Nutritionals' business.  All managers of the Company's departments, including finance,

16  information technology, and legal, and all outside consultants, outside counsel and contractors for

17  information technology, report to me.

18      6.    I am a custodian of Better Nutritionals' business records.  I know the Company's

19  practices and procedures for receiving, creating and maintaining its business records.  The records

20  are received, created and maintained in the ordinary course of the Company's business, at or near

21  the times of the transactions they reference.  All personnel who receive, create and maintain the

22  records have a business duty to do so carefully and accurately, insofar as the Company relies upon

23  its business records for decision-making and the day-to-day conduct of its business.

24      7.    Unless stated otherwise, all facts in this declaration are based upon my personal

25  knowledge, my discussions with members of the Company's management team, my discussions

26  with the Company's outside advisers, my review of documents and information concerning the

27  Company's operations, financial affairs, and restructuring efforts, and/or my personal opinion

28  based upon my experience and general knowledge about the Company.

# INTRODUCTION

8.    Better Nutritionals is a state-of-the-art contract manufacturer and R&D leader in nutritional supplements.  The company specializes in making cutting-edge formulations of gummy supplements focused on personal health and wellness.  Our output capacity currently is about nine billion gummies per year.  We are an FDA-registered manufacturer, and meet stringent standards to label our products as vegan, Kosher-certified, and free of top-8 allergens and gluten.

9.    The Company is _not_ engaged in the manufacture, distribution or dispensement of marijuana.  We also do not open, lease, rent, use or maintain any place to manufacture or distribute marijuana.  Starting in 2019, we manufactured and produced a clean-label functional CBD gummy, which at the time allowed us to expand into the fast-emerging CBD gummy market.  The Company currently produces CBD gummies at its facility in Gardena.  With respect to the CBD gummies produced by the Company at its Gardena facility, I believe that everything we manufactured is consistent with federal law, in that all of our products had less than 0.3% tetrahydrocannabinol ("**THC**") in accordance with USDA regulations.  We were audited by the FDA in March 2019, while making CBD gummies.  The Company has never manufactured any products that have exceeded 0.3% THC.  All of our CBD came from suppliers that provided certificates showing compliance with such THC levels.

10.    Our headquarters is located at 3390 Horseless Carriage Drive, Norco, California.  Our four-building campus in Norco contains approximately 422,000 square feet of manufacturing, warehouse, R&D and office space.  (By comparison, the Gardena facility, which is where we were headquartered until 2021, is about 18,000 square feet.)  Our facility is certified by NSF International and BRCGS, which establish public health and safety standards for food, water and consumer products.

11.    Better Nutritionals is one of Norco's larger employers, with approximately 200 employees.  (This figure include employees hired through staffing agencies, as well as direct employees of Better Nutritionals.)

12.    Better Nutritionals grew significantly from 2019 through 2021.  Sales revenues increased from $21.8 million in 2019 to $222.8 million in 2021.  At the same time, the company's

net income rose from $1.5 million to $23.5 million.  However, for the twelve months ending on September 30, 2022, revenues were down and expenses were up, leading to a net loss during that 12-month period of about $45 million.

13.    The dramatic decrease in revenues and increase in expenses was the result of a series of wrongful acts by a Canadian entity called 12416913 Canada, Inc. ("**12416913 Canada**"), and affiliates of 12416913 Canada, as described in more detail below and in Exhibit "3" hereto.  I am informed and believe that 12416913 Canada is affiliated with the owners of Goli Nutrition, Inc., a Delaware corporation ("**Goli Delaware**"), and Goli Delaware is a subsidiary of Goli Nutrition, Inc., a Canadian corporation ("**Goli Canada**").  For ease of reference, 12416916 Canada, Goli Delaware, and Goli Canada are hereinafter referred to as "**Goli**."

14.    Goli's wrongful conduct is the subject of a lawsuit recently filed by Better Nutritionals.  I believe that the lawsuit could lead to recoveries for Better Nutritionals' estate sufficient to allow for all creditors to be paid in full.

### CORPORATE STRUCTURE

15.    My wife Odelya ("**Odelya**") and I founded Better Nutritionals in 2015 with the dream of building a better nutritional supplement.  Better Nutritionals is a limited liability company formed under the laws of the state of California.

16.    Seventy-five percent (75%) of Better Nutritionals' ownership interests are held by RGL Holdings, LLC, a Delaware limited liability company ("**RGL Holdings**").  I am the sole owner of RGL Holdings.  The other 25% of Better Nutritionals' ownership interests are held by 12416913 Canada.

17.    Goli sells Goli-branded gummy nutritional supplements to retailers and directly to consumers online.  Better Nutritionals is a significant manufacturer of Goli-branded products.

### EVENTS PRECIPITATING THE COMPANY'S BANKRUPTCY FILING

18.    In 2019, Better Nutritionals embarked on an expansion and relocation of its headquarters and operations, from Gardena to Norco.  We did so in response to steadily growing

1  demand from Goli for our products, projections from Goli of exponential increases in its already-

2  significant purchases, and purchase orders for over $258 million for gummies to be produced by

3  Better Nutritionals.

4         19.     Building out the new facility with all-new manufacturing and IT equipment, and

5  associated services, required a major capital commitment.  Goli, which looked to benefit from our

6  increased production capacity, agreed to participate in the acquisition and financing of the needed

7  equipment.  Goli introduced us to Atos IT Solutions and Services, Inc. ("**Atos**"), as a prospective

8  procurement and financing source.

9         20.     My management team and I met, and spoke, with Atos' sales representatives on

10  several occasions.  The representatives claimed that Atos was uniquely positioned, as a technology

11  company, to supply technology-enhanced (or "smart") manufacturing systems unavailable from

12  any of its competitors.  Atos represented that they are running all IT and technology at Disney

13  parks all over the world, Federal Express, UPS, and the Olympic games.  They recommended that

14  Better Nutritionals and Goli purchase multiple lines of manufacturing equipment with a smart

15  feature described as "Codex predictive-maintenance technology" that, according to them, would

16  greatly boost overall performance and efficiency.  They claimed that Atos had extensive expertise

17  and experience in the application of such technology to manufacturing installations.  The pricing

18  and financing terms quoted by Atos included a hefty premium, as compared with those available

19  from other suppliers.  Some of the features Atos was providing were not wanted by, or needed by,

20  Better Nutritionals.  Atos said that the entire package was "take it or leave it."  Nonetheless, Goli

21  insisted on having us proceed with Atos.

22         21.     In 2020, the Company entered into several contracts with Atos.  The overall

23  relationship is governed by a Master Services Agreement dated January 22, 2020 (the "**MSA**"),

24  between Goli Delaware (defined in the MSA as "Customer"), Better Nutritionals (defined in the

25  MSA as "Guarantor"), and Atos (defined in the MSA as "Supplier").  Goli persuaded Better

26  Nutritionals to have Goli be identified in the MSA as the Customer, and to have Goli's name on

27  title to all equipment supplied by Atos under the MSA and related agreements.  Goli promised that

28  title to all equipment would be conveyed to Better Nutritionals at any time at the request of Better

1  Nutritionals.  Consistent with the promise that title would be conveyed to Better Nutritionals, Goli

2  said that Better Nutritionals (not Goli) should make all payments to Atos.

3       22.    The MSA provided that Atos would provide Goli (because it was defined as the

4  "Customer") support, consulting, design, acquisition, project management, implementation and/or

5  related information technology services, with the specifics to be set forth in separate statements of

6  work ("**SOWs**").  Goli, Better Nutritionals and Atos entered into multiple SOWs during 2020,

7  including two under which Atos supplied multiple new manufacturing lines at our Norco facility.

8       23.    Atos started issuing monthly invoices in February 2020.  Even though the MSA

9  described Goli as Customer and Better Nutritionals as Guarantor, Better Nutritionals was the entity

10  that paid Atos' invoices.  We paid Atos until about June 2021, when a dispute arose between Atos

11  and Better Nutritionals.  Until then, Better Nutritionals paid each and every invoice in full, when

12  due.  In all, Better Nutritionals paid Atos nearly $34 million.

13       24.    Better Nutritionals entered into the agreements with Atos and greatly expanded its

14  capacity in reliance on Goli's representations and promises that Goli would significantly increase

15  the amount of product purchased from Better Nutritionals if Better Nutritionals took steps needed

16  to supply that capacity.  Goli repeatedly provided detailed forecasts of the amounts of products it

17  intended to acquire from Better Nutritionals.  Among other things, Goli insisted that they would

18  purchase every bottle that Better Nutritionals could manufacture, and that they needed 12 to 15

19  million bottles per month.  I believe that those promises, representations and forecasts were false

20  and fraudulently made.

21       25.    As a result of and in reliance on Goli's promises, representations and forecasts, the

22  Company incurred substantial costs for infrastructure, materials and supplies to satisfy Goli's stated

23  demand.  Our supply orders eventually became so large that some of our suppliers asked us to

24  substantiate the need for our orders by providing matching purchase orders from Goli.  In 2021

25  alone, Better Nutritionals hired about 600 employees to keep up with Goli's sale forecasts, and

26  even then staff routinely worked overtime and double-time.  Among other things, the Company

27  also paid over $2 million in air freight expenses because Goli demanded that it receive products

28  quickly, multiplying our freight costs in 2021 by over ten times; however, Goli refused to pay

Better Nutritionals for the difference to reimburse the Company for the increased costs incurred because of Goli's demands.

26.    In July 2021, Goli submitted a purchase order for 75 million bottles, for which Goli committed to pay $281 million.  The same month, Goli verbally committed to Better Nutritionals, and to the manufacturer of bottles to be used to satisfy Goli's purchase orders, to purchase another 300 million bottles, for which Goli committed to pay $1.125 *billion*, over a three-year period.  By the end of July, the Company had shipped Goli 7.3 million bottles and Goli claimed that there was still 2 million bottles backordered.

27.    In the first half of August 2021, we ramped up production per Goli's demand, and was on track to produce 9 million bottles for Goli.  However, at that time Goli drastically changed its forecast from 9 million bottles to only 3 million.  Even though they reduced their forecast, Goli refused to allow us to release the products Goli had ordered so we could sell those products to other customers.  Unknown to me at the time, it is my understanding that Goli was attempting to induce a private equity firm to invest in Goli, and used the inflated purchase orders as part of its efforts to obtain funds from investors, but never intended to honor its commitment to Better Nutritionals.

28.    For all of 2021, instead of the 100 million bottles we had prepared to produce for Goli based on its representations and requests, Goli bought only about 50 million bottles.  Goli kept telling us that it would want 9 to 11 million bottles per month, but then was taking delivery of only 1 to 3 million.  We currently have substantial inventory that was produced for Goli based on Goli's representations and promises.  The product is subject to FDA regulations, and a lot of the product is nearing its expiration date.  Of course, we incurred substantial debt to suppliers to manufacture the products that Goli said it would need but then did not take delivery of.  Better Nutritionals has approximately $40 million in ingredients that it purchased to fulfill Goli's purchase orders.

29.    The Company has attempted to adjust its business model by, among other things, developing relationships with new clients.  In mid-2021, about 93% of Better Nutritionals' monthly sales volume was to Goli.  That percentage has declined to 50% to 75%, and we are developing relationships with new customers.  For example, we recently manufactured products for the Amazon Elements brand which it began selling on Prime Day.  We now have substantial business

with Fortune 100 customers.  I believe there are many additional opportunities for new customers because the nutraceutical business is very robust.  The global gummy market size was valued at $16.28 billion in 2020, and is expected to grow at a compound annual growth rate of 12.6% from 2020 to 2028 (https://www.grandviewresearch.com/industry-analysis/gummy-market-report).  In part because Goli had previously committed to taking most of what we were able to produce, we had not previously expanded our customer base.  Now, we are in the process of ramping up our sales staff, but it takes months to obtain a new customer because of R&D and stability studies.  Our newer customers typically pay 50% to 100% in advance.

30.    Unfortunately, the increase in revenues from non-Goli customers has not been adequate to dig the Company out of the deep hole caused by Goli.  As of September 30, 2022, the Company's accounts payable exceeded $55 million.  Creditors include parties that supplied goods, ingredients, equipment, employees and services used by Better Nutritionals in the ordinary course of its business.  Creditors also include contractors who worked on expansions to the Norco facility, and suppliers of equipment and materials used in that construction, so we could be prepared to satisfy Goli's stated needs.

31.    A number of creditors have filed lawsuits and unsuccessfully sought pre-judgment remedies such as writs of attachment.  I believe that there are approximately 28 lawsuits currently pending against Better Nutritionals.  I believe that 2 additional plaintiffs have obtained judgments that have not been satisfied.

32.    Over the past few months, the Company has actively sought offers from third parties to purchase the entirety of the Company's operations for an amount that would allow the Company to satisfy all of its debts.  The Company retained an investment bank, William Hood and Company, to solicit offers.  The Company entered into approximately eight non-disclosure agreements, and engaged in negotiations with one private equity firm that expressed a serious interest in acquiring the Company.  However, it appears that Goli may have been negotiating with the buyer behind our back.  Unfortunately, the offer received was unacceptable and the potential buyer does not intend to provide a full recovery to Better Nutritionals' creditors.

33.     The Company has filed for Chapter 11 to maintain operations, maximize the value of its assets, and reorganize its debts.

### BETTER NUTRITIONALS' CLAIMS AGAINST GOLI

34.     Better Nutritionals has substantial claims against Goli relating to the fraudulent misrepresentations described above and other conduct that has damaged the Company.  Better Nutritionals also has claims against Goli based on, among other things, (a) Better Nutritionals' payment of rent for the Norco facility (as discussed below, Goli is technically the lessee even though Better Nutritionals is the entity that has paid the rent and a $3 million security deposit), (b) payments made by Better Nutritionals to Atos pursuant to the MSA and SOWs, under which Better Nutritionals was identified as "Guarantor" instead of "Customer," and (c) damages caused by Goli's misrepresentations to Better Nutritionals regarding orders to be purchased in the future.

35.     On December 19, 2022, Better Nutritionals filed a lawsuit against Goli and certain of its principals and affiliated companies in the United States District Court for the Central District of California.  A true and correct copy of the complaint is attached as Exhibit "3" hereto.

### THE ATOS LITIGATION

36.     As noted above, Better Nutritionals entered into a MSA and several SOWs with Atos.  In the MSA, Goli was identified as the "Customer" and Better Nutritionals was identified as the "Guarantor."  My understanding is that the MSA provides that any claim or controversy arising out of or related to the MSA must be resolved by arbitration in New York, New York.

37.     The supposedly Codex-enhanced equipment began arriving at the Company's facility in June 2020.  The equipment performed basic manufacturing functions, but lacked the promised Codex enhancements.  It was not until July or August 2021, and after repeated demands by Better Nutritionals, that Atos' technicians visited the Norco facility and attempted to implement the Codex features.  They failed.  Atos' technicians admitted to us that Atos had never previously attempted to implement Codex features in a manufacturing setting.  It turns out that Atos sold and charged premium prices for smart equipment, but delivered only ordinary analog equipment.

38.     Atos failed to deliver various other promised technological enhancements required by the SOWs, including facial recognition, COVID-compliant temperature check stations, camera analytics and license plate tracking.  None of these features were ever implemented, despite Better Nutritionals' repeated requests.

39.     As a consequence of Atos' failures of performance under the agreements, Better Nutritionals incurred significant delays in production, and expenses, including payment to third party vendors to address deficiencies in the systems provided by Atos.

40.     While that was going on, Better Nutritionals identified a lender that was willing to lend the Company then-needed funds, subject to verification of Atos' clear title to the equipment at the Company's facilities.  In February 2021, Better Nutritionals requested that Atos provide records that would have satisfied the new lender.  Atos ignored the Company's repeated requests, and the Company informed Atos that it would suspend monthly payments unless and until Atos provided the title records.  Accordingly, in June 2021, Better Nutritionals suspended payments to Atos.

41.     After many months of discussions, the parties agreed, in principle, to resolve their disputes, subject to execution of formal settlement agreements.  However, the agreements were not fully executed and were never performed.

42.     In February 2022, Atos commenced an arbitration proceeding in New York.  In the arbitration, Atos was seeking more than $25 million under the MSA and related agreements.

43.     On or about March 10, 2022, Atos sent Better Nutritionals and Goli a letter purporting to terminate the MSA and related agreements, and announcing its intention to exercise remedies purportedly available to it at that time.  According to Atos' letter, Atos was at that time owed $25,960,814.90.

44.     The parties engaged in settlement discussions, and draft settlement agreements were prepared.  The settlement agreements were never fully executed.  Indeed, my understanding is that neither Atos nor Goli ever signed the settlement agreements.

45.     On or about April 27, 2022, Atos filed a complaint against Better Nutritionals and Goli in the Riverside County Superior Court (the "**State Court Action**").  The State Court Action is assigned case no. CVRI2201684.

46.    On or about April 29, 2022, Atos filed an application for a right to attach order and an order for issuance of a writ of attachment.  Atos sought such relief on an ex parte basis, without any notice of the application given to Better Nutritionals.  Based on the draft settlement agreements that were never fully executed, Atos claimed that it was owed over $38 million.  The Superior Court denied the application.

47.    On or about May 10, 2022, Atos filed another application for a right to attach order and an order for issuance of a writ of attachment.  Based on this application, Atos claimed that it was owed approximately $26 million.  Atos sought such relief on regular notice.  A hearing on the application was scheduled to be held on July 12, 2022.

48.    I am informed and believe that, a few weeks before the hearing, Atos and Goli reached a settlement.  As a result of the settlement, on July 7, 2022, Atos withdrew is application for a right to attach order and an order for issuance of a writ of attachment.  Atos also dismissed Goli from the State Court Action.  A trial setting conference is currently scheduled to take place in the State Court Action on March 15, 2023.

49.    In the meantime, the arbitration remains pending with the AAA.  In August 2022, Atos amended its statement of claim.  The amended statement alleged that Atos settled with Goli, but still was asserting claims against Better Nutritionals.  According to the amended statement, Atos is seeking an award equal to "the difference between the amount received [by Atos] from Goli and the more than $40,000,000 that Better Nutritionals owes but refuse [sic] to pay."

50.    Notably, Atos refuses to say how much Goli paid to Atos, and refuses to say how much of an award it is seeking in the arbitration.  Goli says that it paid $32 million to Atos – more than Atos itself identified as being owed in March, April and May 2022.  Accordingly, we believe that Atos has been paid in full,  However, to date, Atos has not dismissed the arbitration or the State Court Action.  Better Nutritionals has repeatedly requested that Atos produce a copy of its final settlement agreement with Goli, but Atos refuses to do so.

51.    The arbitration remains pending.  Better Nutritionals has asserted counterclaims against Atos in the arbitration based on Atos' failure to perform its contractual obligations, and for damages caused by Atos when it took certain actions against Better Nutritionals earlier this year.

### THE GARDENA FACILITY

52.     Better Nutritionals' Gardena campus is located at 17120 S. Figueroa Street, Gardena, California.  The Gardena facility is an 18,000 square foot manufacturing facility, which is very small compared to the 422,000 square foot Norco facility.  I am informed and believe that the owner of the Gardena facility is IRI Property Corp. ("**IRI**").

53.     Better Nutritionals has never been the master lessee of the Gardena facility.  The lessee is RGL Management, LLC ("**RGL Management**").  RGL Holdings (the entity that owns 75% of the ownership interests in Better Nutritionals) owns RGL Management.  The monthly base rent owed by RGL Management to IRI is about $55,000.  All or substantially all of the equipment located at the Gardena facility is owned by RGL Management, not by Better Nutritionals.

54.     There is no written sublease agreement between RGL Management and Better Nutritionals.  Better Nutritionals pays RGL Management rent and use of equipment and tenant improvements at the Gardena facility.

### THE NORCO FACILITY

55.     Technically, Better Nutritionals is not the lessee of the Norco campus, which is located at 3300, 3350, 3380 and 3390 Horseless Carriage Drive, Norco, California.  Technically, Goli is the lessee of the property and was supposed to assign the lease to Better Nutritionals when we asked it to do so.  Effective April 1, 2020, Goli entered into a lease with an initial term that will expire on December 31, 2030.  Better Nutritionals is listed as the guarantor.

56.     Because Goli was supposed to assign the lease to Better Nutritionals at a later date, the lease expressly authorized Goli to do so without need for obtaining the landlord's consent. However, when we asked Goli to assign the lease it refused.

57.     Better Nutritionals (not Goli) paid the $3 million deposit upon execution of the lease.  Throughout the term, Better Nutritionals (not Goli) paid rent and other charges directly to the landlord, except I understand that Goli paid the rent for September through December 2022. The base rent currently is about $318,000 per month.  As reflected in the projections attached hereto, Better Nutritionals intends to pay rent to the landlord in January 2023 and thereafter.

58.    As noted earlier, Better Nutritionals has incurred substantial debt in reliance upon Goli's representations regarding future purchase orders.  Among other things, Better Nutritionals hired a contractor, Caliber Construction ("**Caliber**"), that in turn hired subcontractors and purchased materials and supplies, from various companies who have not yet been paid.  I am informed and believe that the property is or has been encumbered by mechanics' liens and/or lis pendenses as a result of the non-payment of these parties.  Accordingly, the landlord declared a default under the lease.  I am informed and believe that, in October 2022, Goli reached a settlement with the landlord and Caliber pursuant to which the landlord withdrew the notice of default and agreed with Goli to forbear from exercising its right to terminate the existing lease for 120 days from the date of the agreement.

## EMPLOYEES AND PAYROLL

59.    Better Nutritionals currently has approximately 80 employees who receive wages and salaries on a bi-weekly basis.  A few employees also are entitled to receive commissions.

60.    Better Nutritionals also has contracts with BRS Staffing ("**BRS**"), Next Level Staffing, Inc. ("**NLS**"), and Stratum HR LLC ("**Stratum**") (collectively the "**Staffing Agencies**").  Under those contracts, the Staffing Agencies provide employees to the Company for assignments at the Company's facilities.  These persons are employees of the Staffing Agencies, not the Company.  The Staffing Agencies handle all recruiting, screening and administrative functions with respect to the personnel assigned by them, and are required to maintain appropriate insurance coverages.  Collectively, the Staffing Agencies currently supply approximately 200 additional personnel.

61.    The Company's most recent payroll period ended on December 10, 2022, covering the period from November 27, 2022, through December 10, 2022.  I believe that payroll for that period was distributed by the Company's payroll service (Paycom) to employees on Friday, December 16, 2022.

62.    The Company's next routine payroll period will end on December 24, 2022, covering the period from December 11, 2022, through December 24, 2022.  Assuming the Court authorizes, payment for this period will be transferred to the payroll service on or about December

28, 2022, and distributed by the payroll service to employees on Friday, December 30, 2022.  Since the bankruptcy petition was filed on December 20, 2022, about nine days' worth of wages, salaries and commissions earned during this period were earned prepetition (the "**Prepetition Earnings**"). No individual employee is owed more than $15,150 of wages, salaries or commissions for that 8-day period.  The Company is requesting authority to pay non-insiders' Prepetition Earnings as part of the next routine payroll, and to pay insiders' Prepetition Earnings once the Company is authorized to pay insider compensation.

63.    In addition to regular wages and salaries, the Company offers its employees certain benefits.  Benefits offered by the Company to employees consist of contributions for medical, dental, vision and life insurance benefits (collectively the "**Employee Benefits**").

64.    For certain employees, the Company contributes toward the premiums for basic medical insurance (the "**Medical Plan**").  The Company pays $420.04 per employee per month, regardless of which plan is selected by the employee.  Premium payments are currently due for November and December 2022.

65.    For certain employees, the Company contributes toward the premiums for dental insurance (the "**Dental Plan**").  The Company pays $11.41 per employee per month, regardless of which plan is selected by the employee.  Premium payments are currently due for November and December 2022.

66.    For certain employees, the Company contributes toward the premiums for vision insurance (the "**Vision Plan**").  The Company pays $8.21 per employee per month, regardless of which plan is selected by the employee.  Premium payments are currently due for November and December 2022.

67.    For certain employees, the Company previously paid life insurance premiums.  The Company paid $8.20 per month for hourly employees (providing for a $10,000 death benefit) and $41.00 per month for salaried employees (providing for a $50,000 death benefit).  We discontinued premium payments in or about April 2022, though my understanding is that the insurance company has not yet formally canceled the policies.

68.     I believe that the continued provision of coverage to employees under the Medical Plan, the Dental Plan, and the Vision Plan is a vital component of the Employee Benefits provided to those employees.  As a result, I believe that it is important that the Company continue providing such benefits and make any necessary payments with respect to any amounts incurred prior to today, and continue providing coverage under the Medical Plan, the Dental Plan, and the Vision Plan in the ordinary course of business.

69.     I believe that the Company's employees' skills, and their knowledge and understanding of the Company's operations, are essential to an effective reorganization of the Company's business or maintenance of the business during the Case.

70.     I also believe that it is important that the Company pay employees' outstanding wages, salaries, and commissions, and honor all of the Employee Benefits, to avoid an interruption in the Company's business.  If the Company does not do so, there is a risk of unmanageable turnover of the Company's work force, and I believe that employees' morale will very likely decline drastically due to, among other things, the economic burdens faced by employees in these tough times.  I believe many of the Company's employees may live paycheck to paycheck, and would suffer harm if they were to not receive payment for the work they performed prior to the Petition Date.

71.     It is my understanding that the term "insider" is defined in the Code to mean, with respect to a debtor that is a corporation, (a) a director of the debtor, (b) an officer of the debtor, (c) a person in control of the debtor, (d) a partnership in which the debtor is a general partner, (e) a general partner of the debtor, and (f) a relative of a general partner, director, officer, or person in control of the debtor.  My understanding is that the Company is required to serve a Notice of Setting/Increasing Insider Compensation, and parties have an opportunity to object to the notice, before compensation is paid to insiders.  The Company intends to comply with those requirements with respect to compensation to be paid to the individuals identified above.

///

///

///

**BANKRUPTCY AND CERTAIN OTHER PROFESSIONALS**

72.     On or about July 1, 2022, Better Nutritionals retained Danning, Gill, Israel & Krasnoff, LLP ("**Danning Gill**"), to provide insolvency-related legal advice.  Subject to Court approval, the Company intends to retain Danning Gill to represent it as its insolvency counsel in this Case.

73.     On or about December 15, 2022, Better Nutritionals retained Force Ten Partners, LLC ("**Force 10**"), to provide financial advisory services, restructuring services, and certain other related services prior to and after the bankruptcy filing.  Among other things, Force 10 assisted the Company in preparing the interim projections attached to this declaration.  Subject to Court approval, the Company intends to retain Force 10 to provide services after Petition Date.  Further information regarding the scope of Force 10's services will be provided in the Company's application for authority to employ Force 10.

74.     On or about December 15, 2022, Better Nutritionals also retained CSA Partners, LLC ("**CSA**"), to perform financial consulting, accounting, and related services to the Company.  CSA worked with Force 10 to prepare the interim projections and will continue to work with them after the Petition Date.  I anticipate that CSA also will be primarily responsible for assisting Better Nutritionals with complying with the requirements of the U.S. Trustee's office and (together with Force 10) preparing schedules and a statement of financial affairs, and preparing monthly operating reports to be filed with the Court.  Further information regarding the scope of CSA's services will be provided in the Company's application for authority to employ CSA.

75.     Better Nutritionals retained Folkenflik & McGerity LLP ("**F&M**"), to effectively function as general counsel of the Company, to negotiate with creditors who had already-pending or potential suits against the Company, to substitute in for its prior counsel in the AAA arbitration, and to advise Better Nutritionals regarding, among other things, Atos' alleged claims against the Company and other claims being asserted against the Company.  Further information regarding the scope of F&M's prior and anticipated representation of Better Nutritionals will be provided in the Company's application for authority to employ F&M as special counsel.

1       76.      Better Nutritionals also retained New York firm Stursberg & Associates

2    ("**Stursberg**") to advise Better Nutritionals regarding, among other things, its reorganization

3    efforts.  Further information regarding the scope of Stursberg's prior and anticipated representation

4    of Better Nutritionals will be provided in the Company's application for authority to employ

5    Stursberg as special counsel.

6       77.      Subject to Court approval, Better Nutritionals may employ other legal, financial

7    and/or accounting professionals.  The identity of the professional(s) and scope of employment will

8    be identified in employment applications filed with the Court.

### The Company's Creditors, Generally

11       78.      As of the date of the preparation of this declaration, the Company and its advisors

12    are continuing to gather information needed to prepare the Company's schedules, statement of

13    financial affairs, and other documents required by the Court and the U.S. Trustee.  Accordingly, I

14    am unable to testify as to exactly how many creditors or potential creditors will be listed in the

15    Company's schedules.  However, excluding employees (each of whom likely has a priority claim

16    for outstanding wages, salaries and commissions earned during the two days prior to the Petition

17    Date), we estimate that the master mailing list will include over 300 creditors, potential creditors,

18    and other parties.

### Utilities

21       79.      In the ordinary course of business, the Company currently uses electric, natural gas,

22    heat, water, sewer, telecommunications, and other services of the same general type or nature

23    originated and provided by approximately five major utility companies (collectively the "**Utility**

24    **Companies**").  A spreadsheet identifying the Utility Companies and, among other things, the

25    average amounts invoiced by each of the Utility Companies on a monthly basis, is attached as

26    Exhibit "2" hereto.

80.    I understand that the Company's filing of its chapter 11 petition occurred during the middle of the billing cycles for many, if not all, of the Utility Companies.  As a result, as of today, there are likely outstanding prepetition amounts owed to the Utility Companies.

81.    I believe that if utility services to the Norco facility are disrupted, even for a brief period of time, the Company will not be able to operate.  I also believe that an interruption in the Company's business will have an adverse effect on the Company's relationships with customers, employees, vendors and other persons with whom the Company conducts business.  I further believe that such a disruption could severely impact the Company's cash flow and ability to reorganize.

82.    Based upon the Company's cash flow projections, including those included in Exhibit "1" hereto, I anticipate that the Company will have adequate cash to meet all of its necessary postpetition operating expenses on a current basis, including payments to the Utility Companies.  However, it is my understanding that section 366 of the Code requires debtors to provide "assurance of payment" to the Utility Companies in the form of a deposit or other enumerated form of assurance.  Accordingly, the Company is proposing to deliver to each Utility Company a deposit equal to the average monthly invoice amount (i.e., the amount identified in Exhibit "2") within 45 days of the Court's entry of an order granting the Company's motion relating to the form, timing and amount of assurance of payment to be provided.

### REQUEST FOR AUTHORITY TO USE CASH COLLATERAL

83.    It is my understanding that, now that the Case has been filed, there are provisions of the Code that must be fulfilled by the Company prior to using the proceeds, products, offspring, rents, or profits of property subject to security interests.  Particularly, it is my understanding that the Company generally must obtain the consent of secured creditors holding liens against the Company's cash collateral, or obtain the Court's approval of the use of cash collateral.

84.    According to the balance sheet as of September 30, 2022, Better Nutritionals had over $118 million of assets at book value.  This included approximately $32.5 million of inventory and $79.5 million of fixed assets.  Currently, cash on hand is approximately $125,000.  I believe

1  that the fair market value of the Company's receivables, inventory and other assets is well more

2  than $10 million.

3      85.    To the best of my knowledge, few creditors claim to have security interests in some

4  or all of Better Nutritionals' assets.  I am informed and believe that, according to a search of the

5  California Secretary of State's records, the following entities have active financing statements or

6  judgment liens:

7          (a)    Atos.  In January 2021, Atos filed a financing statement describing its

8  collateral as any and all accounts receivable of Better Nutritionals.  A true and correct copy of the

9  financing statement is attached as Exhibit "4" hereto.  I believe that this financing statement is

10 based upon an SoW dated December 23, 2020.  For the reasons given above, Better Nutritionals

11 does not believe that it owes any debt to Atos at this time, including under the relevant SoW.

12         (b)    Atos.  In July 2021, Atos filed a second financing statement describing its

13 collateral as equipment sold, financed or leased by Atos to Better Nutritionals.  A true and correct

14 copy of the financing statement is attached as Exhibit "5" hereto.  However, as noted above, under

15 the relevant MSA, Goli was identified as the "Customer" and Better Nutritionals was identified as

16 the "Guarantor."  All subsequent SOWs were entered into pursuant to the MSA.  Further, although

17 Atos and Goli refuse to provide us a copy of their settlement agreement, we believe that it provides

18 that any and all equipment sold, financed or leased by Atos has been (or purportedly been) assigned

19 and transferred to Goli.  We believe this because, among other things, a financing statement that

20 was filed by Goli in August 2022, a true and correct copy of which is attached as Exhibit "6"

21 hereto, indicates that Goli claims to be the owner of substantially the same assets that were

22 identified by Atos in its July 2021 financing statement.

23         (c)    Icon Asset Management AG and Doris Latorre Trust (collectively "**Icon**").

24 In March 2022, Icon filed financing statements that did not describe any collateral.  At the time, we

25 were negotiating with Icon about a potential loan.  That transaction did not occur, so Icon does not

26 have a security interest in any Better Nutritionals property.

27         (d)    Aramark Services, Inc. ("**Aramark**").  On or about October 10, 2022, Better

28 Nutritionals entered into a settlement agreement with Aramark.  Pursuant to a March 2021 contract,

1    Aramark provided certain food services to Better Nutritionals (generally, Aramark operated Better

2    Nutritionals' cafeteria, where meals were offered, free of charge, to Better Nutritional employees).

3    Better Nutritionals agreed to pay Aramark approximately $1.47 million for services previously

4    rendered and for which Aramark had not been paid.  We had hoped to pay this amount in full when

5    the business was sold, and committed to do so.  In the settlement agreement, Better Nutritionals

6    granted Aramark a security interest in substantially all of Better Nutritionals' assets.  True and

7    correct copies of redacted pages of the settlement agreement relevant to Aramark's security interest

8    are attached as Exhibit "7" hereto.  Aramark filed a financing statement on October 11, 2022, a true

9    and correct copy of which is attached as Exhibit "8" hereto.  My understanding is that unless

10    creditors are paid in full, the granting of the security interest in favor of Aramark is an avoidable

11    preferential transfer.

12          (e)      Suitable Staffing Solutions ("**Suitable Staffing**").  In June 2022, Suitable

13    Staffing filed a complaint against Better Nutritionals in L.A. Superior Court.  Better Nutritionals

14    entered into a settlement with Suitable Staffing, but was unable to perform.  On or about October 5,

15    2022, a stipulated judgment was entered for about $2.23 million.  Suitable Staffing filed a Notice of

16    Judgment Lien (JL-1) on November 1, 2022, a true and correct copy of which is attached as Exhibit

17    "9" hereto.  My understanding is that unless creditors are paid in full, the judgment lien is an

18    avoidable preferential transfer.

19          (f)      Sharon and Odelya Hoffman.  In December 2022, the Company needed

20    funds to pay professionals prior to filing its chapter 11 petition.  Efforts to generate a few million

21    dollars of revenue prior to the Petition Date by selling excess finished products prior to December

22    20 were unsuccessful.  As a result, using funds we borrowed from friends and family, Odelya and I

23    loaned the Company $600,000, evidenced by a promissory note and a security agreement.  True

24    and correct copies of these documents are attached as Exhibit "10" hereto.  A true and correct copy

25    of our financing statement is attached as Exhibit "11" hereto.

26          86.      Exhibit "1" hereto contains interim operating projections for the first thirteen weeks

27    after the Case is filed.  These interim projections of cash receipts and disbursements were prepared

28    by Force 10 and CSA, based on information available from the Company.  Force 10 and CSA will

1  continue to refine the projections in the coming weeks, and I anticipate that the Company will file

2  updated projections prior to a final hearing on the Company's motion for authority to use cash

3  collateral.

4

5                            **THE COMPANY'S SCHEDULES**

6        87.    It is my understanding that the Court's local rules provide that, within fifteen days

7  after a debtor files a petition, the debtor must file a variety of schedules, a statement of financial

8  affairs, and various other documents (collectively the "**Schedules**") with the Court.  For a number

9  of reasons, the Company was unable to prepare the Schedules for filing at the same time as their

10  voluntary petitions for relief.

11        88.    It is my understanding that the U.S. Trustee requires that chapter 11 debtors submit

12  numerous reports and information to the U.S. Trustee within seven days after filing for bankruptcy.

13  The Company's management will be diligently working to prepare those reports and gather the

14  documents that need to be submitted.

15        89.    In light of the foregoing, the upcoming holidays (including Hanakkuh, Christmas,

16  and the New Year's Day weekend) and the need for the Company to focus on its business as well

17  as other matters that will arise in the Case during the first few weeks, I do not believe the Company

18  will be able to complete and file its Schedules by January 3, 2023.  The Company is therefore

19  requesting until January 20, 2023, to do so.

20

21        I declare under penalty of perjury under the laws of the United States of America that the

22  foregoing is true and correct.

23        Executed on December 20, 2022, at Norco, California.

24

25                                      _____

26                                      Sharon Hoffman

27

28

# EXHIBIT 1

# PROJECTIONS

**Better Nutritionals LLC**
**Weekly Cash Flow Projections**

| Week Ending | 1<br>Proj<br>23-Dec | 2<br>Proj<br>30-Dec | 3<br>Proj<br>6-Jan | 4<br>Proj<br>13-Jan | 5<br>Proj<br>20-Jan | 6<br>Proj<br>27-Jan | 7<br>Proj<br>3-Feb | 8<br>Proj<br>10-Feb |
|---|---|---|---|---|---|---|---|---|
| **Cash Receipts** | | | | | | | | |
| Collections | 750,000 | 650,000 | 1,572,500 | 1,110,000 | 480,000 | 1,218,500 | 1,575,000 | 475,000 |
| Other | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Receipts** | 750,000 | 650,000 | 1,572,500 | 1,110,000 | 480,000 | 1,218,500 | 1,575,000 | 475,000 |
| | | | | | | | | |
| **Disbursements** | | | | | | | | |
| Raw Materials & Other COGS | (204,327) | (204,327) | (204,327) | (204,327) | (204,327) | (204,327) | (204,327) | (204,327) |
| Corporate Payroll | 0 | (350,000) | 0 | (290,000) | 0 | (290,000) | 0 | (290,000) |
| Health & WC Insurance | 0 | (205,816) | 0 | (50,000) | 0 | (105,816) | 0 | (50,000) |
| Commercial Insurance | 0 | (49,600) | 0 | 0 | 0 | (49,600) | 0 | 0 |
| External Staffing | (136,000) | (136,000) | (167,000) | (167,000) | (167,000) | (167,000) | (167,000) | (167,000) |
| Rent & CAM | 0 | 0 | (520,000) | 0 | 0 | 0 | (520,000) | 0 |
| Utilities | 0 | 0 | 0 | 0 | (152,500) | (8,000) | 0 | (7,500) |
| Other General & Administrative | 0 | 0 | 0 | 0 | (113,608) | (113,608) | (113,608) | (113,608) |
| **Total Operating Disbursements** | (340,327) | (945,743) | (891,327) | (711,327) | (637,435) | (938,351) | (1,004,935) | (832,435) |
| | | | | | | | | |
| **Operating Cash Flows** | 409,673 | (295,743) | 681,173 | 398,673 | (157,435) | 280,149 | 570,065 | (357,435) |
| | | | | | | | | |
| Utility Deposits | 0 | 0 | (168,000) | 0 | 0 | 0 | 0 | 0 |
| Ch 11 Professional Fees | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| U.S. Trustee Fees | 0 | 0 | 0 | 0 | 0 | (10,289) | 0 | 0 |
| **Restructuring Disbursements** | 0 | 0 | (168,000) | 0 | 0 | (10,289) | 0 | 0 |
| | | | | | | | | |
| **DIP Loan Draws (Payments)** | 0 | 0 | 0 | 0 | 565,000 | 0 | 0 | 0 |
| | | | | | | | | |
| **Net Cash Flows** | 409,673 | (295,743) | 513,173 | 398,673 | 407,565 | 269,860 | 570,065 | (357,435) |
| **Beginning Cash** | 126,536 | 536,208 | 240,465 | 753,638 | 1,152,310 | 1,559,875 | 1,829,736 | 2,399,800 |
| **Ending Cash** | 536,208 | 240,465 | 753,638 | 1,152,310 | 1,559,875 | 1,829,736 | 2,399,800 | 2,042,365 |
| | | | | | | | | |
| **Cash Higher (Lower) than Petiton Date** | 409,673 | 113,929 | 627,102 | 1,025,775 | 1,433,340 | 1,703,200 | 2,273,265 | 1,915,830 |

Case 6:22-bk-14723-MH   Doc 14   Filed 12/20/22   Entered 12/20/22 10:27:41   Desc
Main Document    Page 24 of 102

**Better Nutritionals LLC**
**Weekly Cash Flow Projections**

| Week Ending | 9<br>Proj<br>17-Feb | 10<br>Proj<br>24-Feb | 11<br>Proj<br>3-Mar | 12<br>Proj<br>10-Mar | 13<br>Proj<br>17-Mar | 14<br>Proj<br>24-Mar | 15<br>Proj<br>31-Mar | 15 Week<br>Total |
|---|---|---|---|---|---|---|---|---|
| **Cash Receipts** | | | | | | | | |
| Collections | 553,500 | 2,084,000 | 730,000 | 0 | 242,500 | 900,000 | 1,236,000 | 13,577,000 |
| Other | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Receipts** | 553,500 | 2,084,000 | 730,000 | 0 | 242,500 | 900,000 | 1,236,000 | 13,577,000 |
| | | | | | | | | |
| **Disbursements** | | | | | | | | |
| Raw Materials & Other COGS | (204,327) | (204,327) | (204,327) | (204,327) | (204,327) | (204,327) | (204,327) | (3,064,909) |
| Corporate Payroll | 0 | (290,000) | 0 | (290,000) | 0 | (290,000) | 0 | (2,090,000) |
| Health & WC Insurance | 0 | (50,000) | (55,816) | (50,000) | 0 | (50,000) | (55,816) | (673,264) |
| Commercial Insurance | 0 | 0 | (49,600) | 0 | 0 | 0 | (49,600) | (198,400) |
| External Staffing | (167,000) | (167,000) | (167,000) | (167,000) | (167,000) | (167,000) | (167,000) | (2,443,000) |
| Rent & CAM | 0 | 0 | (520,000) | 0 | 0 | 0 | (520,000) | (2,080,000) |
| Utilities | (125,000) | (27,500) | (8,000) | 0 | (132,500) | (27,500) | (8,000) | (496,500) |
| Other General & Administrative | (113,608) | (113,608) | (113,608) | (113,608) | (113,608) | (113,608) | (113,608) | (1,249,686) |
| **Total Operating Disbursements** | (609,935) | (852,435) | (1,118,351) | (824,935) | (617,435) | (852,435) | (1,118,351) | (12,295,760) |
| | | | | | | | | |
| **Operating Cash Flows** | (56,435) | 1,231,565 | (388,351) | (824,935) | (374,935) | 47,565 | 117,649 | 1,281,240 |
| | | | | | | | | |
| Utility Deposits | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (168,000) |
| Ch 11 Professional Fees | (750,000) | 0 | 0 | 0 | (750,000) | 0 | 0 | (1,500,000) |
| U.S. Trustee Fees | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (10,289) |
| **Restructuring Disbursements** | (750,000) | 0 | 0 | 0 | (750,000) | 0 | 0 | (1,678,289) |
| | | | | | | | | |
| **DIP Loan Draws (Payments)** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 565,000 |
| | | | | | | | | |
| **Net Cash Flows** | (806,435) | 1,231,565 | (388,351) | (824,935) | (1,124,935) | 47,565 | 117,649 | 167,952 |
| **Beginning Cash** | 2,042,365 | 1,235,930 | 2,467,495 | 2,079,144 | 1,254,209 | 129,274 | 176,838 | 126,536 |
| **Ending Cash** | 1,235,930 | 2,467,495 | 2,079,144 | 1,254,209 | 129,274 | 176,838 | 294,487 | 294,487 |
| | | | | | | | | |
| **Cash Higher (Lower) than Petiton Date** | 1,109,395 | 2,340,959 | 1,952,608 | 1,127,673 | 2,738 | 50,303 | 167,952 | |

**Better Nutritionals LLC**
**Weekly Cash Flow Projections**

Key Assumptions:
 - Collections are projected by customer and are based on management estimates and recent discussions with customers, including a potential bulk sale from existing inventory.  To be conservative, no collections have been assumed from Goli during this timeframe.
 - Raw Materials and Other COGS are based on maintaining a cost margin of approximately 30% of new production
 - Corporate Payroll is based on the most recent payroll run, less identified cost reductions to be implemented
 - Health, WC, and Commercial Insurance is based on recent payment amounts and include a catch-up of previously outstanding amounts
 - External Staffing is based on recent projections and anticipated production levels
 - Rent, CAM & Utilities are based on recent payment amounts
 - Other G&A includes items such as Bank Fees, Computer Software & Networking Services, Tools & Supplies, Repairs & Maintenance, Outside Services, and Marketing, and is based on recent expense trends since July

 - Utility Deposits assume one month worth of projected Utilities payments
 - Ch 11 Professional Fees are estimated, inclusive of time to obtain court approval and an assumed 20% holdback
 - U.S. Trustee Fees are based on projected disbursements and the current UST Fee structure

 - DIP Loan Draws are based on an assumed DIP Loan available to be drawn in the total amount of $1 million less any funds loaned pre-petition (which are assumed to be $435k); the specifics of this are still being finalized

# EXHIBIT 2

# LIST OF UTILITIES

**Better Nutritional LLC**
**Estimated Monthly Utility Spend**

| Utility Company | Utility Address | Utility Type | Location | Customer Account Number | Service/Sub Account Number | Service Location | Estimated Monthly Spend |
|---|---|---|---|---|---|---|---|
| AT&T | AT&T P.O. Box 5019 Carol Stream, IL 60197-5019 | Telephone | Norco | 831-001-1413 986 | 831-001-1413 987 | 17120 Figuero Gardena CA 90248 | 5,500.00 |
| AT&T | AT&T P.O. Box 5019 Carol Stream, IL 60197-5019 | Telephone | Gardena | 831-001-0347 681 | 831-001-0347 682 | 17120 S Figueroa Gardena CA 90248 | 1,500.00 |
| City of Norco | Utility Billing Division, 2870 Clark Avenue, Norco CA 92860 | Water | Norco | 512280-002 | | 3390 Horseless Carriage Norco CA 92860-3635 | 4,000.00 |
| City of Norco | Utility Billing Division, 2870 Clark Avenue, Norco CA 92860 | Water | Norco | 512250-002 | | 3300 Horseless Carriage Norco CA 92860-3635 | 300.00 |
| City of Norco | Utility Billing Division, 2870 Clark Avenue, Norco CA 92860 | Water | Norco | 512270-002 | | 3380 Horseless Carriage Norco CA 92860-3635 | 300.00 |
| City of Norco | Utility Billing Division, 2870 Clark Avenue, Norco CA 92860 | Water | Norco | 512260-002 | | 3350 Horseless Carriage Norco CA 92860-3635 | 300.00 |
| Golden State Water Company | P.O. Box 9016 San Dimas CA 91773-9016 | Water | Gardena | 94427678233 | | 17120 Figueroa Gardena CA 90248 | 2,100.00 |
| SoCal Gas | P.O. Box C Monterey Park CA 91756-5111 | Gas | Norco | 020 171 2695 0 | | 3390 Horseless Carriage Norco CA 92860-3635 | 7,500.00 |
| SoCal Gas | P.O. Box C Monterey Park CA 91756-5111 | Gas | Gardena | 190 893 9223 7 | | 17120 Figuero Gardena CA 90248 | 7,500.00 |
| Southern California Edison | P.O. Box 300 Rosemead, CA 91772-002 | Electricity | Norco | 700117573441 | 8004245922 | 3390 Horseless Carriage Norco CA 92860-3635 | 126,000.00 |
| Southern California Edison | P.O. Box 300 Rosemead, CA 91772-002 | Electricity | Norco | 700117573441 | 8011213017 | 3300 Horseless Carriage Norco CA 92860-3635 | |
| Southern California Edison | P.O. Box 300 Rosemead, CA 91772-002 | Electricity | Norco | 700117573441 | 8011212774 | 3380 Horseless Carriage Norco CA 92860-3635 | |
| Southern California Edison | P.O. Box 300 Rosemead, CA 91772-002 | Electricity | Norco | 700117573441 | 8011212898 | 3350 Horseless Carriage Norco CA 92860-3635 | |
| Southern California Edison | P.O. Box 300 Rosemead, CA 91772-002 | Electricity | Gardena | 700110661785 | 8001026717 | 17120 S Figueroa St Carson CA | 12,000.00 |
| Southern California Edison | P.O. Box 300 Rosemead, CA 91772-002 | Electricity | Gardena | 700724816982 | 8013059658 | 17210 S Figueroa St Gardena CA 90248 | |
| Southern California Edison | P.O. Box 300 Rosemead, CA 91772-002 | Electricity | Gardena | 700219605721 | 8004118972 | 17232 S Figueroa St Gardena CA 90248 | 150.00 |
| Southern California Edison | P.O. Box 300 Rosemead, CA 91772-002 | Electricity | Gardena | 700219605721 | 8011765295 | 17202 S Figueroa St Gardena CA 90248 | 550.00 |
| Southern California Edison | P.O. Box 300 Rosemead, CA 91772-002 | Electricity | Gardena | 700219605721 | 8004118972 | 17232 S Figueroa St Gardena CA 90248 | 150.00 |
| Southern California Edison | P.O. Box 300 Rosemead, CA 91772-002 | Electricity | Gardena | 700219605721 | 8011765295 | 17202 S Figueroa St Gardena CA 90248 | 150.00 |
| | | | | | | | 168,000.00 |

EXHIBIT 3

COMPLAINT AGAINST GOLI

ROSS L LIBENSON (State Bar No. 181912)
LIBENSON LAW
1939 Harrison Street, Suite 917
Oakland, CA 94612
Telephone: (510) 451-4441
Email ross@libensonlaw.com
*Local Counsel*

MAX FOLKENFLIK
FOLKENFLIK & MCGERITY
1500 Broadway, Suite 810
New York, NY 10036
Telephone: (212)757-0400
Email mfolkenflik@fmlaw.net
(*applying for admission pro hac vice*)
*Attorneys for the Plaintiff*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

_____

| | |
|---|---|
| BETTER NUTRITIONALS, LLC, a California Limited Liability Company, | Case No. |
| *Plaintiff*, | **COMPLAINT FOR STATUTORY AND COMMON LAW TORTS, INCLUDING SECURITIES FRAUD AND COMMON LAW FRAUD, VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF THE DEFEND TRADE SECRETS ACT, BREACH OF CONTRACT, AIDING AND ABETTING, AND, AS TO DLA PIPER LLP (US), LEGAL MALPRACTICE AND BREACH OF FIDUCIARY DUTY** |
| . vs. | |
| GOLI NUTRITION, INC, DEEPAK AGARWAL, MICHAEL BITENSKY, VMG PARTNERS, VMG PARTNERS V, L.P, VMG PARTNERS IV, LP, MERICAL INC.,DLA PIPER LLP (US). | |
| *Defendants*. | |
| | **DEMAND FOR A JURY TRIAL** |

Plaintiff Better Nutritionals, LLC ("Better Nutritionals"), brings this complaint

1  against Defendants Goli Nutrition, Inc. ("Goli"), Deepak Agarwal ("Argarwal"),
2  Michael Bitensky ("Bitensky")(Goli, Agarwal, Bitnsky and their affiliated entities are
3  collectively referred to as the "Goli Defendants"), VMG Partners, VMG Partners V,
4  L.P, VMG Partners IV, LP (hereinafter the "VMG Defendants"), Merical Inc.
5  ("Merical") and DLA Piper LLP (US) (hereinafter "DLA Piper"), and alleges as
6  follows:

**INTRODUCTION**

8      1.    Goli is a retail seller and marketer of nutritional gummy supplements
9  founded and at all relevant times operated by Deepak Agarwal and Michael
10  Bitensky.  Goli sells a range of gummy supplements, but its best-selling products
11  contain apple cider vinegar ("ACV").  Because Goli's gummy products are classified
12  as "Dietary Supplements," they are required to be manufactured is factory that
13  complies with stringent federal and state regulations.  In 2018, Goli sought out
14  Plaintiff Better Nutritionals because it had an governmentally approved
15  manufacturing facility in Gardena California capable of producing the gummy
16  products Goli required.

17      2.    From the start of its relationship with Better Nutritionals, Goli
18  committed to make Better Nutritionals its exclusive manufacturer, and to purchase as
19  many gummies as Better Nutritionals could manufacture to meet explosive consumer
20  demand for Goli's products.  For of the first three years, the relationship was smooth
21  and very profitable for Better Nutritionals.  Goli provided sales forecasts or purchase
22  orders, and Better Nutritionals immediately commenced and quickly completed
23  production based on those forecasts and purchase orders.  Until the summer of 2021,
24  Goli would rouitinely and promptly take delivery and pay for the products.   Better
25  Nutritionals maximum production output at the Gardena facility was approximately
26  400,000 bottles a month.  But Goli was projecting a need for ***millions of bottles a***
27  ***month***, and, accordingly, advised Better Nutritionals that Better Nutritionals would
28  have to increase its production capacity significantly.  Accordingly, during 2019

– 2 –
COMPLAINT

1    Better Nutritionals invested heavily to meet Goli's demand and bring the capacity up

2    to 1,200,000 bottles per month, but Goli demand was for 12-15 million bottles per

3    month.

4        3.    To continue to meet Goli's projected demand, in 2020 Goli convinced

5    Better Nutritionals to open a new approximately 420,000 square foot facility in

6    Norco California.  The Norco facility required a multi-million-dollar lease deposit to

7    the landlord, tens of millions of dollars of capital improvements and nearly $70

8    million in equipment to make it compliant with state and federal requirements for a

9    Dietary Supplement manufacturing facility.  Goli ensured that Better Nutritionals

10   would bear the risk of the hundreds of millions of dollars of investment in and

11   operation of the Norco facility.

12       4.    But Goli also coveted the profits that Better Nutritionals was making

13   and developed a scheme by which it could obtain for itself the profits that would

14   otherwise accrue to  Better Nutritionals. In furtherance of that scheme, Goli

15   engineered a fraudulent stock swap  transaction where Goli obtained  a 25% interest

16   in Better Nutritionals in exchange for a 3% interest in Goli.  Those interests were

17   fraudulently claimed to be equal in value, but the Goli Defendants knew that Goli's

18   25% interest in Better Nutritionals was substantially more valuable than Better

19   Nutritionals' 3% interest in Goli.

20       5.    Worse yet, the agreements for Goli's purchase of the 25% interest in

21   Better Nutritionals contained no restrictions on Goli or its ability to shift production

22   away from Better Nutritionals, but the Stock Swap agreements contained onerous

23   restrictions, including in particular, onerous overbroad restrictions  on the ability of

24   Better Nutritionals to manufacture for other customers who wanted to purchase

25   gummy products from Better Nutritionals .  Further, Goli insisted that Better

26   Nutritionals The  Defendant DLA Piper represented **both** Better Nutritionals and

27   Goli in the negotiation and drafting of these agreements, but in fact DLA Piper only

28   acted in the interests of Goli, and abandoned any duty to its other client, Better

1  Nutritionals. Indeed, Safraz Ishmael, a relative of Defendant Agarwal, was DlA Piper's

2  Partner *in charge of DLA Piper's engagement by Better Nutritionals.*

3        6.     In 2021 Agarwal and Bitensky, provided Better Nutritionals with

4  massive formal sales forecasts and written purchase orders when Goli knew it would

5  not, and could not meet those projections and Goli knew it would not pay Better

6  Nutritionals for the products it had ordered. In July 2021, Goli sent written purchase

7  orders for $281 million worth of product, and gave a verbal purchase order for 300

8  million bottles to be used for finished product (100 million bottles per year for 3

9  years). *But Goli never intended to pay for all of the product it ordered, or to pay*

10  *for the bottles it ordered.* As of this writing Goli has refused to pay for $180 million

11  of product it ordered nor has it paid anything for the 300 million bottles it ordered.

12  In August 2021, without any prior warning, Goli informed Better Nutritionals that it

13  had cut its projections by over 90%.

14        7.     Goli left Better Nutritionals in a desperate position.  It had induced

15  Better Nutritionals to expose itself to well over $100 million of liabilities in the

16  construction and operation of the Norco facility  in reliance on Goli's ever-larger

17  sales forecasts and purchase orders.  Goli had induced Better Nutritionals to commit

18  over 90% of its production capacity to Goli, had forced it to terminate relationships

19  with existing customers and severely limited its ability to service other potential

20  customers. By fraudulently inducing Better Nutritionals to allocate nearly all of its

21  production capacity to Goli, by fraudulently misrepresenting and by breaching its

22  agreement to purchase all that Better Nutritionals could produce, as well as specific

23  purchase orders Goli had issued, Goli exposed Better Nutritionals to severe liability

24  from a host of third parties, jeopardizing the future of the company. and the

25  reputation of the founders in in a close knit industry.  As we show further below,

26  however, Goli had not finished its acts designed to sabotage its former "partner" and

27  to capture for Goli all the profits Better Nutritionals could earn.

28

8.    In October 2021 VMG Partners closed on a $100 million investment in Goli, and secured two of seven board seats along with significant contractually specified control over Goli.  Promptly thereafter, embarked on a a new phase of its scheme:   to steal Better Nutritionals trade secrets and transfer them to another competing manufacturer, Defendant Merical.  Once the Goli Defendants  and the VMG Defendants had assured themselves that Merical was capable, with the use of Better Nutritionals trade secrets, to produce an acceptable product for Goli,  in the fall of 2022 Goli started shifting production from Better Nutritionals to Merical.

9.    In 2022 the end game for the Goli Defendants and the VMG Defendants became clear.  Goli embarked on a plan that would force Better Nutritionals to sell the company at a drastically insufficient price to a buyer ***committed to expanding the business of Goli***.  In that way, Goli could reap the benefits of an effective vertical integration, and shift manufacturing profits from Better Nutritionals to Goli.  The scheme did not work.  Instead Better Nutritionals determined that interests of the Company are best served by seeking to recover the hundreds of millions of dollars it lost because of the fraudulent, illegal and tortious acts of the Defendants.

## **THE PARTIES**

10.    Plaintiff Better Nutritionals, LLC, is a California Limited Liability Company with its principal place of business and headquarters at 3390 Horseless Carriage Road, Norco, CA, 92860.  Better Nutritionals is a contract manufacturer of nutritional gummy products.

11.    Defendant Goli Nutrition, Inc. is a corporation organized under the laws of Canada, with its principal place of business at 1 Westmount Square, Suite 1500, Westmount, H3Z2P9, Quebec, Canada, and under the laws of the State of Delaware.  Goli is a retail seller and marketer of specially manufactured nutritional supplements, including gummies. Starting in 2018, and until recently, Better Nutritionals was the sole manufacturer of the gummy products sold by Goli.

COMPLAINT

12.    Defendant Deepak Agarwal is a co-founder of Goli and served as its Co-Chief Executive Officer /Co- President at all times relevant to this complaint.  On information and belief, Agarwal resides in Montreal, Québec, Canada.

13.    Defendant Michael Bitensky is a co-founder of Goli, and served as its Co-Chief Executive Officer /Co- President at all times relevant to this complaint.  On information and belief, Bitensky resides in Montreal, Québec, Canada.

14.    Defendant VMG Partners is a private equity investment firm that has its headquarters at 39 Mesa Street, Suite 310, San Francisco, CA 94129.  VMG operates through separate investment funds each of which has a specific pool of investment capital and a specific portfolio of investments.  Defendant VMG Partners V, L.P, ("VMG Partners V") was begun in March 2021 with $850 million in capital to invest in health and wellness brands such as Goli.  On information and belief, VMG Partners V is also an investor in Goli Defendant VMG Partners IV L.P.(" VMG Partners IV") is an investor in Goli and has a right to receive profits from that investment. Two members of VMG Partners IV's management team, who are also partners in VMG Partners, sit on Goli's board of Directors..

15.    Defendant Merical is a manufacturer of private label dietary supplements with its manufacturing facility at 233 East Bristol Lane, Orange, CA 92865.  Merical began producing Goli gummy products in October 2022.

16.    Defendant DLA Piper is the United States affiliate of an international law firm with its headquarters at 444 West Lake Street Suite 900 Chicago, IL 60606.  At all relevant times, DLA Piper served as counsel for **both** Plaintiff Better Nutritionals and for Defendants Goli, Agrewal and Bettinsky.

## JURISDICTION AND VENUE

17.    This Court has original jurisdiction pursuant to 28 U.S.C. § 1338(a), and 28 U.S.C. § 1332, and supplemental jurisdiction pursuant to 28 U.S.C. § 1367 as well as pendant jurisdiction over claims based on state law.

18.    Venue is proper in this District pursuant to 28 U.S.C. 1391(c) in that
Defendants are subject to personal jurisdiction in this District.

## **FACTUAL BACKGROUND**

### **A. Better Nutritionals' Early Success**

19.    Husband and wife Sharon and Odelya Hoffman founded Better
Nutritionals in 2015 as a contract manufacturer of nutritional gummy products for
third parties, as well as for its own consumer line of gummy vitamins, "Vitamin
Friends."

20.    Nutritional gummies are nutrient-enriched chewable dietary products
similar to soft candy.  Gummies are an increasingly popular alternative to traditional
multi-vitamins and dietary supplements in pill form because they are easier to ingest
and have appealing textures and flavors.  As of 2020, nutritional gummies were a
$16 billion industry expected to grow at a significant annual rate over the next
decade owing to increasingly health-conscious consumers.

21.    Better Nutritionals quickly made a name for itself by manufacturing
innovative, high-quality products and by becoming one of the most-highly certified
supplement manufacturers in the world.  Within a few years, Better Nutritionals
attracted a significant number of top-tier domestic and foreign clients, including
Abbott Labs, Vita Yummy, Charlotte's Web, Pharmacare (Sambucol), Vesco
Vitamins, and Premama Wellness.

22.    Manufacturing nutritional gummy products is expensive large-scale
chemistry, requiring precise control over a complex and resource-intensive
production process.  At the front end of the manufacturing process, Better
Nutritionals expends significant resources and capital to prepare for production, often
before receiving full payment.  Thus, as is common in the industry and its
commercial partners know, Better Nutritionals is expected to rely and does heavily
on the accuracy — and truthfulness — of the purchase orders and sales forecasts it
receives from its clients.

23.    By late 2018, Better Nutritionals had around fifteen employees and
could manufacture approximately 400,000 bottles of nutritional gummy products
each month out of its small factory in Gardena, California, earning annual revenues
of approximately $4,000,000 and annual profits of $1,000,000.

**B. Goli Enlists Better Nutritionals as Its Sole Manufacturer**

24.    Deepak Agarwal and Michael Bitensky founded Goli in 2017 as a retail
seller of specially manufactured nutritional supplements, including gummies.

25.    Goli secured substantial financial backing to develop and market the
world's first apple cider vinegar gummy ("ACV Gummy"), which it linked to a
range of health benefits, including digestion, weight management, immunity, energy,
and improved complexion.

26.    In late 2018, Goli enlisted Better Nutritionals to be the sole
manufacturer for the ACV Gummy.  Before starting production, Better Nutritionals
provided Goli with detailed per-unit production costs that included Better
Nutritionals' costs, such as ingredients and materials, and costs imposed by third
parties, such as packaging suppliers.  Goli did not dispute these production costs.

27.    The Parties agreed to payment terms in November of 2018.  Goli agreed
to pay Better Nutritionals an agreed price  per bottle (which included ingredients,
supplies, and manufacturing), to advance half of the total cost for each order, and to
pay the remaining amount due when Better Nutritionals released finished and final
batches of gummies from its facility for pickup by Goli (batches that would vary in
quantity depending on Better Nutritionals' production capacity).  These payment
terms required Better Nutritionals to incur the full expense of manufacturing the
gummies with only 50% of the total payment in its coffers.  Prompt pickup and
payment is standard in the industry, both because the products by government
regulation have a limited shelf life, and because the payment of the balance was
crutial to Better Nutritionals business.  Thus, Goli's prompt pickup and payment
after was critical to Better Nutritionals.

28.     With the payment terms in place, Goli placed its first purchase order for 100,000 bottles, with a second order (contingent on Goli's satisfaction with the first) to follow for 300,000 bottles.  In fact, Goli was so pleased that it increased its second order from 300,000 bottles to 600,000 bottles but negotiated a lower price-per-bottle.  This lower price remained constant for years, despite rising supply chain costs and Goli's ever-increasing demand for more product.  Goli's third order, coming shortly after the first two, was for 1,000,000 bottles.  Better Nutritionals manufactured and Goli accepted and paid for each order pursuant to the terms of the Parties' agreement.

29.     Goli described Better Nutritionals' finished product as "simply amazing" and "absolutely perfect."  In May of 2019, Agarwal assured Better Nutritionals' co-founder and CEO, Sharon Hoffman ("Hoffman") on a telephone call that Goli would buy every bottle of Goli gummies Better Nutritionals could produce and even boasted that Better Nutritionals could not produce bottles fast enough to meet Goli's needs.  Agarwal frequently repeated these statements to Hoffman on future telephone calls and over Telegram Messenger, emphatically imploring Hoffman to keep producing greater quantities as quickly as possible.

30.     Following Goli's promise to buy every bottle Better Nutritionals could produce, the Parties shifted to a demand-based ordering process typical in the manufacturing industry.  Goli would submit "sales forecasts" and "purchase orders" at regular intervals (typically monthly) that it expected Better Nutritionals to immediately act upon by reserving production capacity, ordering ingredients, beginning production, and planning for future production.  In general, retail sellers like Goli use this process to minimize stocked inventory, which does not generate value, and avoid paying for warehouse space.

31.     This process repeated over and over again.  Better Nutritionals would receive a sales forecast and purchase order from Goli and immediately start production.  All the while, Goli communicated only one message: that it needed more and more product.  Better Nutritionals relied on Goli's promise and

– 9 –
COMPLAINT

1 representation that it would pay for every bottle of gummies that Better Nutritionals

2 could produce.  As it did so, Better Nutritionals continued to take on greater upfront

3 risk to manufacture a substantially higher volume of gummies at a rapidly increasing

4 pace.

5      32.    Goli's sales forecasts exploded.  In May of 2019, Goli projected a June

6 order of 600,000 bottles per month with a steady monthly rise to approximately 2

7 million bottles per month by December of 2019.  In August of 2019, Goli submitted

8 a purchase order for a remarkable 50 million bottles for delivery "On-Going Up To

9 Dec 31, 2020," which equates to an average of 2.9 million bottles per month.  To

10 produce this quantity, Better Nutritionals understood that it needed to expand its

11 current manufacturing capacity five-fold, as it had reached the limits of its

12 manufacturing capacity at its small Gardena facility, over 80% of which was already

13 dedicated to Goli's needs.  Goli urged Better Nutritionals to find a way to expand its

14 capacity, and to do so as soon as possible.  As it began evaluating opportunities to

15 scale-up, Better Nutritionals relied on Goli's history of timely payment for orders

16 placed to date, representations (often made directly by Agarwal) of sustained high

17 demand in the future, and Agarwal's promises to pay for every bottle of gummies

18 that Better Nutritionals could produce.

19      33.    Goli proposed that the Parties work together to radically expand Better

20 Nutritionals' production capacity to meet Goli's purported needs. In order to do so,

21 Better Nutritionals agreed to open a new facility in Norco California that was capable

22 of producing the amounts that Goli was committing to purchase.

23      34.    Through a series of complex contracts with Better Nutritionals and third

24 parties in early 2020, Goli engineered a multi-pronged plan to ensure that Better

25 Nutritionals would become almost entirely dependent upon Goli. In the negotiation

26 of these contracts, both Goli and Better Nutritionals were represented by Defendant

27 DLA Piper despite the obvious conflicts of interest presented by the dual

28 representation. In breach of its fiduciary duties to Better Nutritionals, Defendant

1    DLA Piper prepared agreements that dramatically favored the interests of Goli and

2    disregarded the interests of Better Nutritionals. A relative of Defendant Arguwal,

3    Safraz Ishmael, the DLA Piper Partner in charge of that firm's **engagement by Better**

4    **Nutritionals,** was working behind the scenes to advance the interests of Goli.

5         35.    In the lease for a new facility in Norco, California (the "Norco Lease"),

6    although Better Nutritionals wanted and expected tto be the tenant, Defendant

7    Agarwal said that  Goli should be identified as the "tenant" and Better Nutritionals

8    was identified as a "guarantor.  Similarly, in contract for manufacturing-related IT

9    services and equipment in that facility with Atos IT Solutions and Services, Inc.

10   ("Atos"), it normally would be expected that Better Nutritionals would be the

11   customer and Goli would be the guarantor.  But Goli was identified as the

12   "customer" and Better Nutritionals was again identified as a "guarantor."  Better

13   Nutritionals would be the sole occupant of the new facility and would be the sole

14   user of the IT services and equipment, but as a result of the contracts, Goli obtained

15   title to the equipment, and control over Better Nutritionals occupancy, even

16   thoughBetter Nutritionals made all payments for rent, and paid $34 million for the

17   equipment.

18        36.    Defendant Agrawal promised that the lease and title to the equipment

19   would be transferred to Better Nutritionals on request, but nothing in the governing

20   contracts protected Better Nutritionals' right to obtain title to the equipment or the

21   protection that a direct tenancy would have afforded.    When Better Nutritionals

22   requested transfer of the tenancy and the title to the equipment, Defendant Agrawal

23   refused.

24        37.    At the time, Better Nutritionals was a relatively small business that

25   could serve its pre-Goli customers in its 18,000 square foot Gardena facility, for

26   which its monthly rent was $10,000.  The facility at Norco was approximately

27   420,000 square feet, with a monthly rent of $350,000 – 35 times what Better

28   Nutritionals had paid at Gardena.

38.     Better Nutritionals paid rent for the Norco facility, directly to the landlord as well as paying the $3,000,000 security deposit, and $30,000,000 in capital improvements needed to bring the Norco facility online.  Better Nutritionals, not Goli, paid Atos $34 million for the equipment and IT services.

39.     Goli continued to submit ever-increasing sales forecasts and purchase orders and to pay for Better Nutritionals' finished product.  There was no cause for Better Nutritionals to question whether these orders and sales forecasts reflected actual consumer demand for Goli's products; the proof seemed to be in the payments it received.  Indeed, Goli repeatedly told Better Nutritionals that it was facing substantial backlogs in filling orders for Goli gummies, at least in part because, as Argawal told Sharon Hoffman, Goli was the "#1 Best Selling Health Brand on Amazon."

40.     Goli engaged Centerview Partners in 2020 to explore a sale of Goli. . In January 2020 Goli proposed what it referred to as a "stock swap" in  which Goli would receive a 25% interest in Better Nutritionals and Sharon Hoffman would receive a 3% interest in Goli, Inc. (the "Stock Swap").    Goli, Agrewal and Bitensky represented that the 3% interest in Goli Inc. was equal in value to the 25% in Better Nutritionals.  That representation was knowingly false when made.   In fact, the 25% interest in Better Nutritionals was far more valuable than the 3% interest in Goli.

41.     In January 2020 Sharon and Odelya agreed to the Stock Swap   The Stock Swap was memorialized in late 2020 in a series of complex agreements between Sharon and Odelya Hoffman on one hand, as owners of Better Nutritionals, and certain entities controlled by Defendant Agrewal, and as well as certain entities controlled by Defendant Bitensky,  and Goli.  Goli, Agrewal and Bitensky represented that the 3% interest in Goli remained equal in value to the 25% in Better Nutritionals.  That continued representation was knowingly false when made.   In fact, at all relevant times the 25% interest in Better Nutritionals was far more valuable than the 3% interest in Goli.  Goli has concealed its financial statements and

1   audit reports from Better Nutritionals.  On information and belief, those financial

2   statements and audit reports would contain further evidence of Goli's fraud.

3       42.    The agreements memorializing the Stock Swap required Better

4   Nutritionals to give Goli a right of first refusal should Better Nutritionals desire to

5   allocate production capacity to another client.  Further, Goli insisted on maintaining

6   a "buffer capacity" over and above the capacity needed based on Goli's sales

7   forecasts.  The buffer capacity was 10% that Goli could immediately demand, plus

8   an additional 30% buffer capacity above any given sales forecast.  As a result, Better

9   Nutritionals was required to keep idle 100 % of  Goli's forecasted need plus an

10  additional 40% over and above the forecasted needs.

11      43.    At this time, there was a scarcity in gummy manufacturing capacity in

12  the market.  But by its agreements with Goli, Better Nutritionals was prohibited from

13  using any excess capacity to manufacture for any purchaser who sold "Competing

14  Products." Competing Products is defined in the agreements with incredible and

15  unnecessary overbreadth.

16      44.    The agreements state:

17      "**Competing Products**" means any products that are the same as or

18      substantially similar to Goli Products. A product will be considered the

19      same as or substantially similar to Goli Products if it contains the same

20      or substantially similar active ingredient(s) as those in Goli Products or

21      the same main marketed ingredients as Goli Products.

22

23      45.    Under the agreements Goli insisted that Better Nutritionals terminate

24  existing client relationships and forgo new relationships.  Better Nutritionals

25  terminated its relationship with Pharmacare (Sambucol) and Vesco Vitamins LLC,

26  for which Better Nutritionals had manufactured a line of gummy products. Better

27  Nutritionals also turned down substantial business opportunities from major

28

marketers of nutritional products, including Nestle, Garden of Life, Nature's Bounty, and Sports Research.

46.     DLA Piper served as counsel for both Goli and Better Nutritionals in the negotiation of those agreements.  In violation of its fiduciary duties to Better Nutritionals, DLA Piper failed to include any limitation on the breadth of these over-broad restrictions, any limitation on these obligations, or any protections for Better Nutritionals from abuse by Goli.

47.     Further DLA Piper failed to include in these agreements any requirement that Goli purchase products exclusively from Better Nutritionals, or that the "buffer be reduced or suspended if Goli failed to meet certain product purchase threshholds.  Nor did the Stock Swap agreements provide any other protections for Better Nutritionals such as a minimum "take or pay" commitment, that would limit Better Nutritionals loss in the event that Goli failed to meet its projected purchases.  Those limitations on Goli would have been expected in agreements of this type that had been negotiated at arm's length by different attorneys representing the competing interests of each of the parties.

**D. Better Nutritionals Scales Up to Keep Up With Goli's Sales Forecasts**

48.     Goli, Agarwal, and Bitensky knew the effort, expense and risk that Better Nutritionals faced to meet Goli's increasingly large production demands.  In 2021 alone, Better Nutritionals hired **600** employees to keep up with Goli's sales forecasts, yet staff still routinely worked overtime.

49.     Better Nutritionals also spent heavily on the supplies and services necessary to manufacture Goli products.  Of course, each dollar represented further exposure to third-parties, because Better Nutritionals was responsible for funding these materials and services, regardless of whether Goli changed its production demands.  In 2021, when Goli accounted for 93% of Better Nutritionals' revenue, Better Nutritionals paid over $200,000,000 to over 500 vendors to obtain, among

1 other things, the raw ingredients, packaging materials, and the technical and
2 logistical support for Goli products.

3      50.      Better Nutritionals' supply orders eventually became so large that some
4 suppliers asked Better Nutritionals to substantiate the need for its orders by providing
5 a matching purchase order from Goli.  At Better Nutritionals' request, Goli supplied
6 a purchase order, which Better Nutritionals provided to its suppliers.  Goli continued
7 to submit sales forecasts that Better Nutritionals would immediately act upon by
8 reserving production capacity, ordering ingredients, and beginning production.  Goli
9 insisted that Better Nutritionals maintain enough raw materials for 3 months'
10 manufacturing need (based on Goli's projections) due to the supply chain challenges
11 in 2021following the Covid pandemic.

15      51.      In order to meet Goli's projections and representations, Better
16 Nutritionals' projected production capacity for Goli products would continue on a
17 straight-line increase throughout 2021.  Better Nutritionals' "Total Practical
18 Capacity" of 4,759,772 bottles per month in April of 2021 was set to increase to
19 6,310,194 bottles in May, 7,180,538 in June, 8,225,017 in July, 9,49,718 in August,
20 and to a staggering 12,762,753 by December.  Based on Goli's projections and
21 promises, Better Nutritionals sought to reach a peak manufacturing capacity of ***28
22 million*** bottles per month by the third quarter of 2022.

23      52.      In July of 2021 Goli submitted a purchase order for ***75 million*** bottles
24 July 16, 2021, for which Goli committed to pay Better Nutritionals $281,000,000.
25 At the time that this purchase order was submitted, Goli, its Board of Directors and
26 the VMG entities were aware that Goli could not use and would never pay for all of
27 the product ordered.  Ultimately Goli refused to take delivery or pay for $160 million
28 of that purchase order.

53.     In addition, also in July, Goli gave a verbal purchase order another for **300 million** bottles, for which Goli committed to pay Better Nutritionals $1,125,000,000 over a three year period. Agarwal and Goli's Controller communicated the 300 million bottle order directly to Better Nutritionals' COO, as well as to the owner of the bottle manufacturer, Comar.  Goli, its Board of Directors and the VMG entities were aware of that order and they were also aware that Goli would never need anything close to that number of bottles in the periods specified.. At that time, Defendant Agarwal stated that the deal with VMG had been reached and that the parties were in the process of negotiating the final documents.

**E.   Goli Suddenly Radically Downsizes its Orders and Refuses to Take Delivery or Pay for Product it had Ordered.**

54.     In July, Defendant Agarwal complained about a "shortfall" in Better Nutritionals production of two  to three million bottles of gummies.  A few weeks later,  Goli requested a meeting with Better Nutritionals, which occurred on August 10, 2021.  Agarwal, Bitensky, Hoffman, and Better Nutritionals' CFO and COO attended.  During the meeting, Goli announced that it would cut its sales forecast by a staggering **56%**, from Nine million to four  million bottles in August, and from 12 million bottles to 6.4 million bottles in December.  For 2022 the numbers dropped from 15 million bottles per month to 6-7 million bottles per month.   Goli  provided a revised forecast reflecting this cut.  Hoffman wrote to Agarwal at the time that the news was "shocking."

55.     Goli also made clear that ***it would not honor*** the full July purchase order and announced to that it held a surplus in its warehouses of ***12 to 14 million bottles***. In May, June and July Better Nutritionals only produced a total of 12,910,285 bottles.  At some point ***long prior to July 2021, Goli clearly was aware that the projections*** being submitted to Better Nutritionals and on which Better Nutritionals was reasonably relying, ***were knowingly false and a fraud on Better Nutritionals***. Goli knew before May 2021 that ***it was unable to sell any*** of the additional bottles

1  that Better Nutritionals was producing in May, June and July.  In reliance on Goli's

2  fraudulent statements, Better Nutritionals incurred substantial costs that would have

3  been avoided had Goli not made its knowingly false projections and submitted

4  knowingly fraudulent  purchase orders that it never intended to honor.

5        56.    Agarwal stated in August 2021 that mearly a few months earlier, in June

6  of 2021, he had just learned that consumer demand had dropped, which he attributed

7  to a hodge-podge of unverified issues with Facebook's advertising algorithm.  On

8  information and belief Goli was well aware of a drop in consumer demand long

9  before that.  Goli's own emails and purchase orders confirm its deception.  For

10  months, it told Better Nutritionals that Goli faced substantial customer backorders.

11  Those representations were knowingly false.  Better Nutritionals reasonably relied on

12  those representations and incurred significant costs for the purchase of ingredients as

13  well as related labor and other manufacturing costs.

14        57.    Sharon promptly wrote to Goli to advise it that based on Goli's new

15  information Better Nutritionals had substantial excess capacity which it sought to use

16  to manufacture products for other customers.  Better Nutritionals agreed to make

17  Goli its first  priority for production of product for Goli was  impacted by producing

18  for other customers.  Nonetheless, Goli continued to insist that Better Nutritionals

19  keep a 40% "buffer" capacity over the amount being forecast by Goli.  Goli also

20  insisted that "Better Nutritionals will not onboard Goli competitors or use the Goli

21  mold/bottle."  Because of the onerous definition of "Goli competitors," that

22  restriction severely limited the customers Better Nutritionals could work for.  In light

23  of Goli's July oral purchase order for 300 million bottles, the continued insistence on

24  the limitation on the use of the Goli mold/bottle exposed Better Nutritionals to

25  substantial penalty payments that Better Nutritionals was not able to mitigate by

26  using those bottles for other customers.

27        58.    By the summer of 2021, VMG had still not finalized its investment in

28  Goli.  While Goli waited for the VMG deal to close, Agarwal repeatedly urged Better

– 17 –
COMPLAINT

1  Nutritionals to "stay the course" and maintain production capacity for Goli.  In fact,

2  Goli claimed that its orders would rise by the end of the year and soon return to at

3  least 6 million bottles per month, then eventually reach 12 to 15 million bottles per

4  month. On information and belief, VMG was aware of those representations and both

5  Goli and VMG knew that those representations were false.

6       59.     Better Nutritionals relied on those false representations in the continued

7  conduct of its business.  It later became clear that Goli's continued

8  misrepresentations and unwillingness to help Better Nutritionals reduce the losses

9  caused by Goli's breach of its commitments to purchase products it had ordered were

10  part of a plan to inflict unsustainable losses on Better Nutritionals and thereby to

11  force it into a sale of the Company  that would be to Goli's benefit.

12       60.     The VMG deal closed in October of 2021, resulting in a $100 million

13  purchase of a 4.5% equity stake which it purchased from Defendants Agarwal and

14  Bitensky.  As a 3% owner of Goli, Sharon Hoffman said that he should have been

15  offered to participate *pari pasu* in the VMG purchase of equity.  Agarwal agreed, but

16  on information and belief Goli never sought to include Sharon Hoffman in the sale of

17  equity.  To justify that failure Defendant Agarwal represented to Sharon that VMG

18  would be having an Initial Public Offering in a few months, and that at that time

19  Better Nutritionals' stock in Goli would be worth much more than the current

20  valuation.  That representation was knowingly false.  On information and belief,

21  VMG was aware that Goli would make that representation and was aware of its

22  falsity.  Goli claimed to have a valuation $2.5 billion, at that time.  On informationa

23  and belief, that claim was knowingly false.

24       61.     Goli and VMG had a different plan in mind.  Instead of an IPO in the

25  short term, Defendant Agarwal proposed that he could force Better Nutritionals into

26  a sale to a buyer who was committed to expanding Goli's business.  Once that sale

27  occurred, the Goli could effectively claim the benefits of vertical integration and shift

28  to Goli the profits Better Nutritionals would earn under the existing arrangement.

62.     In furtherance of that plan, once the VMG deal closed, Goli presented Better Nutritionals with a sales forecast for the first half of 2022 of only ***600,000*** bottles per month, representing a 94% decline from the 9 million bottles per month Goli had claimed it would need just a few months earlier, and an 80% decline from the 3 million bottles per month in Goli's July 2021 sales forecast.

63.     Shortly thereafter, in November 2021, Yundi Liang, an employee of Better Nutritionals with a degree in food science and significant familiarity with Better Nutritionals confidential suppliers, and trade secret processes, left Better Nutritionals and shortly thereafter went to a competitor producer of gummy products, defendant Merical.   Apparently, unknown to the Hoffmans or Better Nutritionals, VMG and Goli were planning to divert production of Goli products from Better Nutritionals to Merical.

64.     Sometime thereafter, Better Nutritionals received a phone call from one of its vendors, Herbstreith & Fox, asking about an inquiry they received from a gummy manufacturer. The gummy manufacturer was Merical.  Merical asked about Pectin, one of the main raw materials Better Nutritionals uses. Herbstreith & Fox gave them over a dozen different options but they asked specifically for one option, which was the exact formulation Better Nutritionals purchased from Herbstreith & Fox. Merical referenced the item number specifically which is not a published number and is only known by Herbstreith & Fox and Better Nutritionals. This particular pectin was formulated specifically for Better Nutritionals due to its unique formulation requirement.

65.     Shortly before that call, a Production employee that worked for Merical for approximately 12 years, left Merical and was hired at Better Nutritionals as a production employee. This Production employee was at Better Nutritionals for 2 weeks, then left. Better Nutritionals confirmed that he went back to Merical.  As a production employee, he had access to Better Nutritionals' batch records, cooking sheets, recipes, and confidential information about suppliers.  At about the same

1    time, Better Nutritionals learned that Goli and Merical had called Better Nutritionals'

2    flavor supplier, Custom Flavors, and sought the exact flavor that Better Nutritionals

3    was using to manufacture the Goli gummies.

4         66.    In March of 2022, Sharon and Odelya Hoffman met for dinner with

5    Wayne Wu, one of the directors appointed by VMG to the Goli Board.  The next day,

6    Sharon and Odelya met with Johnathan Marshall, another director appointed by

7    VMG to the Goli Board.  In those meetings, Sharon and Odelya explained that Better

8    Nutritionals had been placed in an impossible position by Goli's repeated

9    misrepresentations about its need for product and continued refusal to honor its

10   purchase orders.

11        67.    Goli's failure to honor purchase orders was particularly acute with

12   respect to $18 million worth of Goli gummies that already had been manufactured

13   for Goli because those products have a limited shelf life.  The refusal to honor the

14   300 million bottle verbal  purchase order creates a particular problem because Better

15   Nutritionals has a penalty fee of 2 cents per bottle if Better Nutritionals fails to take

16   delivery of  the bottles.

17        68.    Following that meeting, instead of any effort to have Goli live up to its

18   obligations, VMG continued with its plan to shift production from Better Nutritionals

19   to Merical.  In breach of its obligations of confidentiality, and its fiduciary duties to

20   Better Nutritionals as a shareholder of Better Nutritionals, with the knowledge and

21   agreement of VMG and the Goli Board, Goli sought to enable Merical to unlawfully

22   use Better Nutritionals trade secret information in competition with Better

23   Nutritionals.

24        69.    In July of 2022, Agarwal and Bitensky visited Better Nutritionals'

25   Norco facility and informed Hoffman and Better Nutritionals' CFO and COO that

26   the terms of Goli's deal with VMG require Goli to work with other gummy

27   manufacturers to produce Goli-branded product.  The deal with VMG had been

28   finalized the prior October.  Apparently Goli and VMG waited to ensure that VMG

could obtain and use Better Nutritionals trade secrets before announcing this contract term supposedly agreed to nearly a year earlier.  Goli did not plan to acquire gummy products from Merical until October.  It then projected that it would buy 250,000 bottles of gummies from Merical in October 2021, and 500,000 bottles of gummies from Merical  in November. We are unaware of the amount of purchases made in the last year, but even at a steady state of the 500,000 November 2021 rate, that would amount to 6 million bottles, and the total paid to Merical, rather than to Better Nutritionals would be over $25 million.

## J. The Fallout and Substantial Harm That Goli, Agarwal, and Bitensky Caused to Better Nutritionals

70.     The consequences of Goli's precipitous drop in production demand were swift, severe, predictable, and — according to the plan Goli engineered — borne disproportionately by Better Nutritionals.  With monthly revenue plummeting, Better Nutritionals now faced payment obligations for the Norco Lease, for IT services and equipment, and to third-party suppliers of ingredients, materials, staff, and packaging necessary to produce Goli's product, in addition to payroll and capital improvement costs.  Better Nutritionals had been a significant driver of the local economy but now had to layoff its valued employees.  Better Nutritionals had incurred these obligations and hired these employees for the sole purpose of keeping up with Goli's false sales forecasts and purchase orders.

71.     In September of 2021, Better Nutritionals had been valued at $1.35 billion.  As of this filing, Goli is seeking to force Better Nutritionals to take an offer from a third-party buyer that values Better Nutritionals at under $90 million.. To make matters worse, Better Nutritionals has had to contend with a looming financial disaster without the lucrative business opportunities that it had terminated or turned down at Goli's behest (such as Nestle, Garden of Life, Nature's Bounty, and Sports Research). Goli has recently demanded a materially lower price-per-bottle. Apparently, Goli understands that it pushed Better Nutritionals into a corner and now

1  believes that it can take what it wants, when it wants it,  and pay what it chooses to
2  pay and when it chooses to pay.

3      72.    Accordingly, Goli owes Better Nutritionals $180 million for orders that
4  it placed throughout 2022, including charges for finished goods for that Goli refuses
5  to accept.  Goli also owes Better Nutritionals tens of millions of dollars to Better
6  Nutritionals for raw materials, packaging, penalties, and storage costs, as well as for
7  the labor necessary to produce the massive monthly quantities in Goli's sales
8  forecasts and purchase orders. Under common law subrogation, therefore, Goli also
9  liable for over $100 million expended by Better Nutritionals in tenant improvements
10 and equipment purchases.

11                       **FIRST CAUSE OF ACTION**
12      **(Defend Trade Secrets Act Against the Goli Defendants, the VMG**
13                       **Defendants, and Merical)**

14     73.    Better Nutritionals incorporates each of the preceding paragraphs as if
15 fully set forth herein.

16     74.    Better Nutritionals was the owner of the above-mentioned trade secrets,
17 including but not limited to the processes it used to make its gummy products and
18 specific details and item numbers of custom produced supplies Better Nutritionals
19 ordered to produce its gummy products, suppliers and formulations.  Those trade
20 secrets  are "trade secrets" within the meaning of 18 U.S.C. §1839 (3).

21     75.    The Goli Defendants, the VMG Defendants and Defendant Merical
22 obtained and misappropriated those trade secrets by improper means within the
23 meaning of 18 U.S.C. §1839 (5) and (6).  Such misappropriation was willful and
24 malicious.

25     76.    Accordingly, pursuant to 18 U.S.C. § 1836 (b)(3) Better Nutritionals  is
26 entitled to an award of damages for actual loss caused by the misappropriation of the
27 trade secrets and damages for any unjust enrichment caused by the misappropriation
28 of the trade secrets that is not addressed in computing damages for actual loss, in an

_– 22 –_
**COMPLAINT**

1    amount to be proven at trial, but no less than $50 million, exemplary damages of two

2    times the compensatory loss for additional damages of no less than $100 million, and

3    attorneys' fees..

4        77.    Better Nutritionals is also entitled pursuant to 18 U.S.C. § 1836 (b)(2)

5    to civil seizure of all product manufactured for Goli using Better Nutritional trade

6    secrets injunctive relief pursuant to 18 U.S.C. § 1836 (b)(3)(A) prohibiting the Goli

7    Defendants, the VMG Defendants and Merical or any other manufacturer supplying

8    products to Goli from continuing to use Better Nutritionals trade secrets and

9    prohibiting the continued employment by Merical of former employees of Better

10   Nutritionals who had access to Better Nutritionals trade secrets.

11                              **SECOND CAUSE OF ACTION**

12              **(Fraudulent Misrepresentations against the Goli Defendants )**

13       78.    Better Nutritionals incorporates each of the preceding paragraphs as if

14   fully set forth herein.

15       79.    As a result of Better Nutritionals' reasonable reliance on the foregoing

16   intentional fraudulent misrepresentations by the Goli Defendants, Better Nutritionals

17   suffered monetary damages and Better Nutritionals' hard-earned reputation has been

18   severely damaged causing damages that continue to increase and will be proven at

19   trial but no less than $300 million.

20                               **THIRD CAUSE OF ACTION**

21              (**Aiding and abetting against the VMG  Defendants)**

22       80.    Better Nutritionals incorporates each of the preceding paragraphs as if

23   fully set forth herein.

24       81.    At all times commencing at least in July 2021, the VMG Defendants

25   were aware of the Goli Defendants intentional fraudulent misrepresentations, and

26   Goli's intention to defraud Better Nutritionals.  With that awareness, the VMG

27   Defendants provided substantial assistance to Goli's efforts to defraud Better

28   Nutritionals. That substantial assistance included the VMG Defendants' approval of

1   and, through its appointed directors on Goli's Board, participation in Goli's breaches

2   of its contractual obligations to Better Nutritionals, as well as Goli's intentional

3   violations of Better Nutritionals confidential information and trade secrets.

4       82.    As a result of the foregoing, the VMG Defendants are jointly and

5   severally liable for the damages incurred by Better Nutritionals damages that

6   continue to increase and will be proven at trial but no less than $300 million.

7                      **FOURTH  CAUSE OF ACTION**

8       **(Violation of the Racketeer Influenced and Corrupt Organizations Act**

9                **(RICO) against Goli, Agarwal, and Bitensky)**

10      83.    Better Nutritionals incorporates each of the preceding paragraphs as if

11  fully set forth herein.

12      84.    The RICO Defendants, Goli, Agarwal, and Bitensky, individually and

13  acting for one another and in concert with each other, have committed the

14  following predicate acts of "racketeering activity" within the meaning of 18

15  U.S.C. § 1961(1). The RICO Defendants have engaged in a "pattern of

16  racketeering activity" within the meaning of 18 U.S.C. § 1961(6) by numerous

17  acts of racketeering activity over a several year period.

18      85.    The intentionally fraudulent misrepresentations alleged above were

19  conveyed either by telephone, or by e-mail, or by other means of electronic

20  communication using the facilities of the internet.  Those fraudulent

21  misrepresentations therefore constitute wire fraud in violation of 18

22  U.S.C.§1343.

23      86.    The wrongful acts alleged constitute a pattern of racketeering activity

24  which occurred after January 1, 1992 and are within a 10 year period of each

25  other and this action as prescribed by 18 U.S.C. §1961(5).

26      87.    Throughout the relevant time period, Goli was an "enterprise" within

27  the meaning of 18 U.S.C. § 1961 (4).  In addition, the individual RICO

28

COMPLAINT

1    Defendants. acted as an association-in-fact and "enterprise" within the meaning
2    of 18 U.S.C. § 1961(4).

3         88.    The RICO Defendants have conducted and participated in, directly
4    or indirectly, the affairs of the enterprises described above through the pattern of
5    racketeering activity described above in violation of 18 U.S.C. § 1962(c). All RICO
6    defendants, exercised control over the above mentioned enterprises through the
7    acts of each other and in agreement and conspiracy with each other, as part of
8    their fraudulent scheme. The RICO Defendants have conspired to violate 18
9    U.S.C. §§ 1962(a), and 1962(c) through a pattern of racketeering activities, in
10   violation of 18 U.S.C. § 1962(d).

11        89.    Better Nutritionals has been injured in its businesses and property
12   by reasonable reliance upon the false and fraudulent misrepresentations and
13   omissions to state material facts by the RICO Defendants, including, those set
14   forth and referred to above.

15        90.    Defendants have violated 18 U.S.C. §§ 1962(c) and 1962(d) and
16   as a proximate result of the aforesaid violations, plaintiffs have suffered
17   damages in the amounts of not less than $300 million, plus consequential
18   damages, in an aggregate amount to be proven at trial.

19        91.    By reason of such violations, the RICO Defendants are liable to
20   plaintiff for treble the damages sustained by Plaintiff, as well as Better
21   Nutritionals' costs of suit and reasonable attorneys' fees pursuant to RICO
22   §1962(c).

23              **FIFTH CAUSE OF ACTION**

24        **(Securities Fraud against Goli, Agarwal, and Bitensky)**

25        92.    Better Nutritionals brings this cause of action alternatively should the
26   Court determine that no breach occurred as pled in the Fifth Cause of Action.

27        93.    In engaging in the actions and course of conduct alleged with respect
28   to the Stock Swap, Goli, Agarwal, and Bitensky each, on more than one occasion,

1  used a manipulative and deceptive device or contrivance in connection with the

2  purchase and or sale of securities; made untrue statements of material facts and

3  omitted to state material facts necessary in order to make the statements, in light of

4  the circumstances under which they were made, not misleading; and engaged in

5  acts and manipulative practices which were intended by defendants to operate and

6  did operate as  a fraud or deceit upon Plaintiff, all in violation of Section 10(b) of

7  the  Securities Exchange  Act and Rule 10b-5.  In particular, the representation

8  that 3% of Goli Inc. stock was equivalent in value to 25% of the ownership of

9  Better Nutritionals was knowingly false and fraudulent.  The issuance of

10  promissory notes without any date on which the notes are due was a deceptive

11  device or contrivance.

12      94.    As a direct and proximate result of the violation of Section 10(b) and

13  Rule 10b-5, Better Nutritionals sustained actual and incidental damages.  Goli

14  deprived Better Nutritionals of the profits to which Better Nutritionals is entitled to

15  void the purchase by Goli of 25% of Better Nutritionals.

16

17  **SIXTH  CAUSE OF ACTION**

18  **(Breach of Contract or Alternatively Breach of Output / Requirements**

19  **Contract against Goli)**

20      95.    Better Nutritionals incorporates each of the preceding paragraphs as if

21  fully set forth herein.

22      96.    At all relevant times, Agarwal and Bitensky were Goli's principals,

23  were central to decision-making and day-to-day operations at Goli, routinely

24  communicated with Better Nutritionals regarding matters material to this cause of

25  action, and made material statements on which Better Nutritionals relied.

26      97.    At all relevant times, Better Nutritionals and Goli were capable of

27  contracting.

28

98.    At all relevant times, and at least as early as May of 2019, Better Nutritionals agreed to produce and Goli promised to purchase Goli-branded nutritional gummies in a quantity measured by the requirements that Goli provided from time to time, but at minimum the entire output that Better Nutritionals could produce.   Goli delivered to Better Nutritionals purchase orders that it has failed to honor that at this time amounting to $180 million.

99.    In addition, from time to time, Goli provided Better Nutritionals with sales forecasts and purchase orders that conveyed estimates of Goli's inventory requirements to serve as reasonable guideposts for Better Nutritionals as to production capacity and supplies.

100.    At all relevant times, Better Nutritionals put forth its best efforts in good faith to produce at least the quantity of bottles in each of Goli's sales forecasts and purchase orders by reserving production capacity, ordering ingredients, and beginning production immediately.

101.    Better Nutritionals performed all of its other duties, covenants, and promises under the Parties' agreement.

102.    Only Goli had actual knowledge of consumer demand for its products, and its resulting inventory needs.  This information was not available to Better Nutritionals.  Thus, Goli was obligated to act in good faith by submitting to Better Nutritionals sales forecasts and purchase orders that accurately conveyed Goli's inventory needs.  In violation of this obligation, Goli submitted sales forecasts and purchase orders to Better Nutritionals that did not reflect actual consumer demand for its products.  Indeed, at certain times, Goli knew that consumer demand for its products was declining, that it did not need and did not intend to accept the quantity of bottles in its sales forecasts and purchase orders.

103.    Goli was obligated to act in good faith by purchasing at a the agreed price per bottle Better Nutritionals' output of Goli-branded nutritional gummies, which Better Nutritionals produced in good faith based upon Goli's sales forecasts

1  and purchase orders.  In violation of these obligations, Goli failed to purchase Better

2  Nutritionals output of Goli-branded nutritional gummies.

3      104.   Goli breached its contracts with Better Nutritionals.  In addition, as a

4  direct and proximate result of Goli's bad faith, Better Nutritionals sustained actual

5  and incidental damages.  Goli deprived Better Nutritionals of the profits to which

6  Better Nutritionals would have been entitled had Goli performed under the contract

7  and caused Better Nutritionals to incur substantial and unavoidable costs to perform

8  under the contract such that it will not be able to reduce its damages by non-

9  performance.  Accordingly, damages are due to Better Nutritionals from Goli  in an

10  amount to be proven at trial of no less than $ 200 million.

11                    **SEVENTH CAUSE OF ACTION**

12                  **(Legal Malpractice against DLA Piper)**

13      105.   Better Nutritionals incorporates each of the preceding paragraphs as if

14  fully set forth herein.

15      106.    In acting as counsel for both Goli and also Better Nutritionals and

16  Sharon Hoffman, and failing to act to obtain and preserve critical rights of Better

17  Nutritionals and Sharon Hoffman, DLA Piper failed to exercise the ordinary

18  reasonable skill and knowledge commonly possessed by a member of the legal

19  profession. But for DLA Piper's malpractice, Plaintiff would not have been in the

20  position a) where Goli could refuse to pay for $180 million of product it had ordered,

21  b) where Goli could dramatically curtail its purchases from Better Nutritionals

22  substantial advance notice and without penalty, c) where Better Nutritionals paid all

23  lease expenses, tenant improvement expenses and purchases of equipment, but Goli

24  was able to retain its position as tenant and title to all equipment,  and d) where Goli

25  could shift production away from Better Nutritionals.  Accordingly, Plaintiff is

26  entitled to damages in an amount to be proven at trial but no less than $400 million.

27

28

COMPLAINT

107.    As a result of the foregoing, Plaintiffs have been damaged as a result of Defendant's malpractice in an amount to be determined at trial, but no less than $200 million.

## EIGHTH CAUSE OF ACTION

### (Breach of Fiduciary Duty against DLA Piper)

108.   Better Nutritionals incorporates each of the preceding paragraphs as if fully set forth herein.

109.   As counsel for Better Nutritionals, DLA Piper had fiduciary duties to its client.

110.    DLA Piper breached its fiduciary duty to Better Nutritionals when acting as counsel for both Goli and also Better Nutritionals and Sharon Hoffman, by placing the interests of Goli above the interests of Better Nutritionals and Sharon Hoffman and failing to act to obtain and preserve critical rights of Better Nutritionals and Sharon Hoffman. But for DLA Piper's breaches of its fiduciary duties to Better Nutritional, Better Nutritionals would not have been in the position a) where Goli could refuse to pay for $158 million of product it had ordered, b) where Goli could dramatically curtail its purchases from Better Nutritionals substantial advance notice and without penalty ,c) where Better Nutritionals paid all lease expenses, tenant improvement expenses and purchases of equipment, but Goli was able to retain its position as tenant and title to all equipment, and d) where Goli could shift production away from Better Nutritionals.

111.    As a result of the foregoing, Plaintiffs have been damaged as a result of Defendant's malpractice in an amount to be determined at trial, but no less than $200 million.

## NINTH CAUSE OF ACTION

### (Subrogation against Goli)

112.   Better Nutritionals incorporates each of the preceding paragraphs as if fully set forth herein.

113.   As previously alleged, Goli is the tenant at the Norco facility, and the "customer" on the purchases of equipment, while Better Nutritionals is only the "guarantor" of those agreements.

114.   Accordingly, Better Nutritionals has a right of subrogation to recover over $100 million it expended as guarantor for the benefit of the tenant and the title holder to the manufacturing equipment at the Norco facility.

**WHEREFORE**, Better Nutritionals respectfully requests judgment against defendants and each of them as follows:

a)   As to the First Cause of Action (i) damages for actual loss caused by the misappropriation of the trade secrets, and (ii) damages for any unjust enrichment caused by the misappropriation of the trade secrets that is not addressed in computing damages for actual loss, collectively in an amount to be proven at trial but no less than $ 50 million together with (iii) exemplary damages of two times the compensatory loss (an additional $100 million) and (iv) attorneys' fees;

b)   As to the Second and Third Causes of Action for damages in an amount to be proven at trial, but no less than $300 million;

c)   As to the Fourth Cause of Action for treble the compensatory damages sustained by plaintiff of no less than $300 million, or $900 million as well  costs of suit and reasonable attorneys' fees;

d)   As to the Fifth Cause of Action for an order voiding Goli's acquisition of a 25% interest in Better Nutritionals;

e)   As to the Sixth Cause of action for damages in an amount to be proven at trial, but no less than $200 Million

f)   As to the Seventh and Eighth Cause of Action, for damages in an amount to be proven at trial, but no less than $200 million;

g)   As to the Ninth Cause of Action for damages in an amount to be proven at trial, but no less than $100 million.

h)    As to all Causes of Action, for costs, pre-judgment interest and such other and further relief that the Court deems proper.

PLAINTIFF HEREBY DEMANDS A JURY TRIAL PURSUANT TO LOCAL RULE 38-1.

DATED: December 18,  2022

> Respectfully Submitted,
>   Folkenflik & McGerity LLP
> By:___/s/ Max Folkenflik_____
>   1500 Broadway, Suite 810
>   New York, New York 10036
>   (212) 757-0400
>   Email: mfolkenflik@fmlaw.net
>   *Attorneys for Plaintiff*
>
> ROSS L LIBENSON(State Bar No. 181912)
> LIBENSON LAW
> 1939 Harrison Street, Suite 917
> Oakland, CA 94612
> Telephone: (510) 451-4441
> Email ross@libensonlaw.com
> *Local Counsel*

EXHIBIT 4

UCC-1 FILED BY ATOS (JAN. 2021)

**UCC FINANCING STATEMENT**
FOLLOW INSTRUCTIONS

For Office Use Only

**-FILED-**

File #: U210018522118
Date Filed: 1/19/2021

**A. NAME & PHONE OF CONTACT AT FILER (optional)**

**B. E-MAIL CONTACT AT FILER (optional)**

**C. SEND ACKNOWLEDGMENT TO:  (Name and Address)**

*\*\*\*PLEASE RETURN TO\*\*\**
*CSC*
*2710 Gateway Oaks Drive, Suite 150N*
*Sacramento, CA 95833*
*Acct. #10011306*

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| Better Nutritionals, LLC | | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | | STATE | POSTAL CODE | COUNTRY |
| 17120 South Figueroa Street, Unit B | Gardena | | CA | 90248 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| | | | | | |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| Atos IT Solutions and Services, Inc. | | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | | STATE | POSTAL CODE | COUNTRY |
| 4851 Regent Boulevard | Irving | | TX | 75063 | USA |

4. COLLATERAL: This financing statement covers the following collateral:

**Any and all accounts receivables, and all corresponding or derived cash on hand, deposit accounts, rights to proceeds, substitutes, additions, accessions, or replacements thereof, whether now owned or hereafter acquired or arising of the Debtor identified herein from any source (collectively "Receivables"), including but not limited to any and all Receivables arising from the sale of the 'Goli' branded consumer products through any and all distribution and retail sales channels, retailers or merchandisers.**

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien  ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor  ☐ Consignee/Consignor  ☐ Seller/Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
**Atos IT Solutions and Services, Inc. is a Delaware corporation.**

PK2 616388 002

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)    International Association of Commercial Administrators (IACA)

B0361-7594 01/19/2021 5:00 PM Received by California Secretary of State

EXHIBIT 5

UCC-1 FILED BY ATOS (JULY 2021)

B0415-3003 07/30/2021 5:00 PM Received by California Secretary of State

███████████
███████████
███████████

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

| For Office Use Only |
| --- |
| **-FILED-** |
| File #: U210071831523 |
| Date Filed: 7/30/2021 |

A. NAME & PHONE OF CONTACT AT FILER (optional)

B. E-MAIL CONTACT AT FILER (optional)

C. SEND ACKNOWLEDGMENT TO:  (Name and Address)

⌐     ***PLEASE RETURN TO*** ¬
     *CSC*
     *2710 Gateway Oaks Drive, Suite 150N*
     *Sacramento, CA 95833*
     *Acct. #10011306*
⌊     ⌋

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
| --- | --- | --- | --- | --- |
| **Better Nutritionals, LLC** | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| | | | | |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| **17120 South Figueroa Street, Unit B** | **Gardena** | **CA** | **90248** | **USA** |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Individual Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
| --- | --- | --- | --- | --- |
| | | | | |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| | | | | |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| | | | | |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
| --- | --- | --- | --- | --- |
| **Atos IT Solutions and Services, Inc.** | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| | | | | |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| **4851 Regent Boulevard** | **Irving** | **TX** | **75063** | **USA** |

4. COLLATERAL: This financing statement covers the following collateral:

**Equipment sold, financed, or leased by Secured Party to Debtor, whether existing or hereafter so acquired by Debtor, including but not limited to, the equipment described in the Exhibit A - Listed Equipment attached hereto and incorporated herein by reference (the "Listed Equipment"); and all substitutes, additions, accessions, or warranty or other replacements of any of the foregoing; and all corresponding or derived rights to proceeds from any liquidation or sale of any of the foregoing; and any of the foregoing as may be affixed or considered a fixture to real property whether now or hereafter.**

**Secured Party asserts a purchase money security interest and first priority security interest and lien in the Listed Equipment. The Listed Equipment may be, without limitation, located at, delivered to, installed, or affixed as a fixture to, the Debtor's operating building facilities with physical addresses located at:**
**3300 Horseless Carriage Drive, Norco CA 92860;**
**3350 Horseless Carriage Drive, Norco CA 92860;**
**3380 Horseless Carriage Drive, Norco CA 92860; and**
**3390 Horseless Carriage Drive, Norco CA 92860**

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
**Atos IT Solutions and Services, Inc. is a Delaware corporation.**
b2s 936789

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

International Association of Commercial Administrators (IACA)

b2s 936789

B0415-3004 07/30/2021 5:00 PM Received by California Secretary of State

# UCC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS

**9. NAME OF FIRST DEBTOR:** Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

| | |
|---|---|
| **9a. ORGANIZATION'S NAME** | |
| Better Nutritionals, LLC | |
| OR **9b. INDIVIDUAL'S SURNAME** | |
| **FIRST PERSONAL NAME** | |
| **ADDITIONAL NAME(S)/INITIAL(S)** | **SUFFIX** |

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**10. DEBTOR'S NAME:** Provide (10a or 10b) only one additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

| | | | | |
|---|---|---|---|---|
| **10a. ORGANIZATION'S NAME** | | | | |
| OR **10b. INDIVIDUAL'S SURNAME** | | | | |
| **INDIVIDUAL'S FIRST PERSONAL NAME** | | | | |
| **INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S)** | | | | **SUFFIX** |
| **10c. MAILING ADDRESS** | **CITY** | **STATE** | **POSTAL CODE** | **COUNTRY** |

**11.** ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (11a or 11b)

| | | | | |
|---|---|---|---|---|
| **11a. ORGANIZATION'S NAME** | | | | |
| OR **11b. INDIVIDUAL'S SURNAME** | **FIRST PERSONAL NAME** | **ADDITIONAL NAME(S)/INITIAL(S)** | | **SUFFIX** |
| **11c. MAILING ADDRESS** | **CITY** | **STATE** | **POSTAL CODE** | **COUNTRY** |

**12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):**

See Exhibit A - Listed Equipment attached hereto and incorporated herein by reference (the "Listed Equipment").

| 13. ☑ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable) | 14. This FINANCING STATEMENT: ☐ covers timber to be cut ☐ covers as-extracted collateral ☑ is filed as a fixture filing |
|---|---|
| **15.** Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest): CRPF IV HCD | **16.** Description of real estate: Legal Desc: 22.90 ACRES NET IN PAR 2 PM 213/095 PM 30649 SubdivisionName PM 30649 Acres 022.90 NET LotType Parcel Parcel 2 RecMapType Parcel Map MapPlatB 213 MapPlatP 095

APN: 129200011 with following addresses:
3300 Horseless Carriage Drive, Norco CA 92860;
3350 Horseless Carriage Drive, Norco CA 92860;
3380 Horseless Carriage Drive, Norco CA 92860; and
3390 Horseless Carriage Drive, Norco CA 92860 |

**17. MISCELLANEOUS:**

**Exhibit A – Listed Equipment**

| Vendor / Manufacturer | Item | (Quantity) & Description |
|---|---|---|
| OTC Candy Equipment | | MANUFACTURING LINES |
| | 1. | (Complete Multi-component Production Line) SKU P1012 OTC Gel complete non Starch 1000 |
| | 2. | (Complete Multi-component Production Line) SKU P1017 Lab Line |
| SHANGHAI FUDE MACHINERY MANUFACTURING CO., LTD (aka Sinofude) | | MANUFACTURING LINES |
| | 1. | (6) Full Automatic New Design Gummy Candy Production Lines customized per specifications, kettles, carts and trays. |
| FORDS Packaging Systems Ltd | | CAPPING, SEALING, FEEDING SYSTEMS WITH APPLICABLE FORMAT CHANGES |
| | 1. | (Line 1) - Better Nutritionals Ref: B4-1(Fords ref 2008-5) |
| | 2. | (Line 2) - Better Nutritionals Ref: G-1(Fords ref 2111-4) |
| | 3. | (Line 3) - Better Nutritionals Ref: B1-1(Fords ref 2112-4) |
| | 4. | (Line 4) - Better Nutritionals Ref: B1-2(Fords ref 2113-4) |
| | 5. | (Line 5) - Better Nutritionals Ref: B1-3(Fords ref 2114-4) |
| | 6. | (Line 6) - Better Nutritionals Ref: B2-1(Fords ref 2115-4) |
| | 7. | (Line 7) - Better Nutritionals Ref: B2-2(Fords ref TBA) |
| Crown Lift Trucks | | LIFT TRUCKS, BATTERIES, AND CHARGERS |
| | 1. | (8) Encore RM Series, Reach Trucks |
| | 2. | (8) V-Force Batteries |
| | 3. | (8) V-Force Chargers |
| | 4. | (8) Encore SC Series, Sit-Down Counterbalanced Trucks |
| | 5. | (8) V-Force Batteries |
| | 6. | (8) V-Force Chargers |
| | 7. | (2) Encore C5 Pneumatic, Internal Combustion Trucks |
| | 8. | (1) CGC45S-9 10,000 lb. Capacity, 4-Wheel, Internal Combustion Truck |
| | 9. | (4) Encore C5 Cushion, Internal Combustion Trucks |

B0415-3005 07/30/2021 5:00 PM Received by California Secretary of State

**Exhibit A – Listed Equipment**

| Mettler Toledo | | WEIGHING BALANCES, PLATFORMS, INTERFACES, ANCILLARY EQUIPMENT |
|---|---|---|
| | 1. | (3) Balance XSR104 Product ID 30355485 |
| | 2. | (1) Balance XSR1202S Product ID 30317127 |
| | 3. | (4) Balance XSR6001S Product ID 30317496 |
| | 4. | (7) Hai. Moisture Analyzer HC103 (115V) Product ID 30216103 |
| | 5. | (15) Seven Excellence pH meter S400 Product ID 30046240 |
| | 6. | (15) pH electrode InLab Viscous Pro-ISM Product ID 51343151 |
| | 7. | (15) InLab cable MultiPin-BNC/RCA 1.2m Product ID 30281896 |
| | 8. | (3) Marble Slab (13 X20 X2 Thick) Product ID 63053978 |
| | 9. | (12) Damping Element Product ID 63053973 |
| | | ---------- |
| | 10. | (1) PC Electronic Box IND970 Product ID 30500816 COM 1-3 Interface, RS232 Interface, SICSpro Scale Interface |
| | 11. | (1) Human Machine Interface IND970 Product ID 30500815 |
| | 12. | (6) High Precision Platform PBK989 Product ID 30214791 |
| | 13. | (2) High Precision Platform PBK989 Product ID 30214791 |
| | 14. | (1) Cable M12 Ethernet-RJ45 5m Product ID 22017610 |
| | 15. | (2) Cable M12 USB type A 0.2m Product ID 22017604 |
| | 16. | (5) Terminal ICS4_9 Product ID 64087984 |
| | 17. | (1) DataLogic PowerScan PM9300 Wireless Barc Product ID 30097616 |
| | 18. | (1) Zebra ZD620 Direct Thermal Label Printer Product ID 30097616 |
| | 19. | (6) Cable M12-R/A Ethernet-RJ45 20.0m Product ID 22021091 |
| | | ---------- |
| | 20. | (8) High Precision Platform PBK989 Product ID 30214791 Model PBK989-AB15 |
| | 21. | (8) High Precision Platform PBK989 Product ID 30214791 Model PBK989-AB30 |
| | 22. | (8) High Precision Platform PBK989 Product ID 30214791 Base Model: PBK989 |
| | 23. | (10) Floor Scale PFD779 US11 Product ID 30405123 Model: PFD779 Load Cell SLB615D-2.2t C10 M12 Plug, Platform PFD779 SS 10K 60x60 |
| | 24. | (3) High Precision Platform PBK989 Product ID 30214791 Model PBK989-A3 |
| | 25. | (10) Weighing Terminal IND570 Product ID 30116176 |
| | 26. | (21) Human Machine interface IND970 Product ID 30500815 |
| | 27. | (10) PC Electronic Box IND970 Product ID 30500816, COM 1-3 Interface, SICS-Scale-RS232 Interface [1] |
| | 28. | (8) PC Electronic Box IND970 Product ID 30500816, COM 1-3 Interface, SICSpro Scale Interface [3] |
| | 29. | (3) PC Electronic Box IND970 Product ID 30500816, COM 1-3 Interface, SICSpro Scale Interface [1] |
| | 30. | (21) Cable M12 Ethernet-RJ45 5m Product ID 22017610 |
| | 31. | (42) Cable M12 USB type A 0.2m Product ID 22017604 |
| | 32. | (10) Cable M12 RS232-SICS Scale Product ID 22017602 |
| | 33. | (21) DataLogic PowerScan Barcode Scanner Product ID 30097616 |
| | 34. | (21) Zebra Thermal Transfer Label Printer Product ID 30097616 |
| | 35. | (1) Software FOWN System Product ID 21901145 |
| | 36. | (1) License FOWN 21CFR part11 Product ID 21901147 |
| | 37. | (1) License FOWN Active substances Product ID 21901148 |
| | 38. | (3) License FOWN Master data management Product ID 21901153 |
| | 39. | (1) License FOWN Change order tool Product ID 21901157 |
| | 40. | (21) License FOWN Dispensing & production Product ID 21901167 |
| | 41. | (1) License FOWN ERP gateway / DB Product ID 21901164 |
| | 42. | (21) License FOWN ERP gateway per disp. st. Product ID 21901163 |
| | 43. | (1) License FOWN Stock function Product ID 21901150 |
| | 44. | (1) Doc. FOWN Validation volume 1 (EN) Product ID 21901220 |

B0415-3006 07/30/2021 5:00 PM Received by California Secretary of State

B0415-3007 07/30/2021 5:00 PM Received by California Secretary of State

### Exhibit A – Listed Equipment

| | | |
|---|---|---|
| Lanner | 1. | (3) Smart Gateway SKU A-LEC-2580-711A-2A1 Fanless with O-Card-Wificard-WPEQ-261ACN(BT) |
| Southwest Warehouse Solutions | | VERTICAL LIFTS AND STORAGE, PUSH BACK SYSTEMS, & VEHICLE(S) |
| | 1. | (6) Modula Vertical Lift VLM Model ML50D-9,300 |
| | 2. | (2) Mechanical Straddles - Series 21 |
| | 3. | (1) 2021 Off – Highway Pro-Spotter 2017-B6.7 |
| | 4. | Push Back Systems |
| | | (6 bays) Push Back System, 4 pallets deep (Raw Goods) |
| | | (4 bays) Push Back System, 2 pallets deep (Raw Goods) |
| | | (7 bays) Push Back System, 5 pallets deep (Packaging) |
| | | (5 Bays) Push Back System, 2 pallets deep (Packaging |
| | | (2 Bays) Selective Racking System, 1 pallet deep (Packaging) |
| Bull Sequana | 1. | Edge Server SKU M0-BES-UNIT-ATO Edge Server (Serial Number XAN-SE2-00299) |
| McKenna Boiler Works Inc. | | BOILERS, TANKS, PUMPS, AND ASSOCIATED EQUIPMENT |
| | 1. | (6) IT-00110 50 HP High-Pressure Scotch Marine Firetube Boiler |
| | 2. | (1) IT-00557 MODEL 4260 FEEDWATER TANK WITH MECHANICAL FLOAT AND VALVE |
| | 3. | (1) IT-00559 STEAM SPARGE INJECTOR PACKAGE |
| | 4. | (1) IT-00558 TANK INSULATION PACKAGE |
| | 5. | (1) IT-00339 Tank Insulation Package |
| | 6. | (1) IT-00549 MODEL 2860 MCKENNA ASME "U" STAMP CODE BLOWDOWN TANK |
| | 7. | (3) IT-00404 NV Vertical Booster 12/12 304SS/EPDM 2HP 230/460V 3PH TEFC 60Hz |
| Atlas Copco Compressors LLC | | COMPRESSSED AIR EQUIPMENT |
| | 1. | (1) 8150036200 ZH500-150-60 Model ZH500-150 Plus packaged three-stage centrifugal air compressor |
| | 2. | (1) 8102199265 FD+1750-WC - 460/3/60 FD1750+-WC Water-Cooled Saver-Cycle Refrigerated Dryer |
| | 3. | (1) 8154000412 ZT90VSD STD- P-8.6-60-460V oil-free LP air compressor |
| | 4. | (1) 8154000412 ZT90VSD STD-P-8.6-60-460V oil-free LP air compressor |
| | 5. | (1) 8154000641 ZR160VSD+-P-10.4-60-460V oil-free LP air compressor |
| | 6. | (1) 8102044008 EWD 1500C NPT 110V |
| | 7. | (1) 8102194109 FD310VSD-A-460-NPT Air-Cooled Saver Cycle Refrigerated Dryer |
| | 8. | (1) 8102194109 FD310VSD-A-460-NPT Air-Cooled Saver Cycle Refrigerated Dryer |
| | 9. | (2) 8102297903 FILTER UD310+ (NPT 2 1/2) Coalescing Filter |
| | 10. | (1) 8102121162 PD+ 1800F ASME W/115V DRAIN Coalescing Filter |
| | 11. | (1) 1280567300 LV3800-150 3,800Gal. 150PSI ASME Vertical Receiver |
| | 12. | (1) 1280014705 CE-320-307 Closed Loop Cooling System |
| RGL Management, LLC | 1. | (Multiple) Warehouse racks (3rd party manufacturer). |
| PPM Technology Holdings LLC | | CONVEYORS AND ASSOCIATED WORKSTATIONS, CONTROL PANELS, & EQUIPMENT |
| | 1. | (7) 4340 / PPM Technologies Straight Belt Conveyors |
| | 2. | (7) 4340 / PPM Technologies Incline Belt Conveyors |
| | 3. | (7) 4713 / EZ Swap Oil Drums |
| | 4. | (7) 4716 / PPM Flavorite Belt Workstations |
| | 5. | (7) 4756 / PPM Technologies Mini VF Conveyors |
| | 6. | (1) 4390 / Control Panel – Pre-wired |
| FANUC America Corporation | 1. | (7) M-710iC/45M Robots with R-30iB Plus Controllers and Teach Pendants, and associated risers, barriers, light curtains, and ancillary equipment. |

## Exhibit A – Listed Equipment

| Keyence Corporation of America | | BOTTLE IMAGING EQUIPMENT |
|---|---|---|
| | 1. | (10) MK-G1000PY Industrial Inkjet Printer Yellow Ink Model |
| | 2. | (10) MK-P5 Console for MK-G Series |
| | 3. | (10) MK-D1A Dock for MK-G Series |
| | 4. | (10) MK-B1W Backup Module for MK-G Series |
| | 5. | (4) MK-C1 Monitoring Unit for MK-G Series |
| | 6. | (5) MK-KY2H Yellow Ink Incl. 2 cartridges of MK-30 pcs |
| | 7. | (4) MK-S04 Standard Solvent 4 cartridges of MK-20 Solvent |
| | 8. | (2) MK-S02C Standard Solvent for Cleaning 2 catrg of MK-20 clean fluid set |
| | 9. | (10) OP-35373 Mounting Bracket for MK |
| | 10. | (10) OP-77251 AC Cable for USA/Canada |
| | 11. | (4) OP-87837 Nozzle for MK (PY/PW) |
| | 12. | (10) OP-78632 Trigger Mounting Bracket for MK |
| | 13. | (10) OP-73864 Standard Quick Disconnect Cable M8, 4-pin, 2m length |
| | 14. | (10) OP-23980 Additional Component Mounting Bracket for FU Series |
| | 15. | (10) FS-N41C Fiber Optic Sensor Amp: M8 QD, Main, PNP/NPN, IO-Link |
| | 16. | (10) FU-R67G I09 Act. Rec., Guarded Tough-Flex 1M |
| American Covers Inc. | 1. | (2) CT404021 Storage Container Cover - High Profile |
| | 2. | (2) CT544023 Storage Container Cover |
| Dura-Ramp Inc. | 1. | (1) (DR-M30) Dura-Ramp Mobile Portable Steel Loading Dock |

B0415-3008 07/30/2021 5:00 PM Received by California Secretary of State

EXHIBIT 6

UCC-1 FILED BY GOLI

B0933-8104 08/02/2022 5:00 PM Received by California Secretary of State

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

For Office Use Only

**-FILED-**

File No.: U220216664633

Date Filed: 8/2/2022

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
Donna Truong 1-212-588-5558

**B. E-MAIL CONTACT AT FILER (optional)**
dtruong@dwpv.com

**C. SEND ACKNOWLEDGMENT TO: (Name and Address)**

***PLEASE RETURN TO***
CSC
2710 Gateway Oaks Drive, Suite 150N
Sacramento, CA 95833
Acct. #10027767

d In: CA
Of State

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. **DEBTOR'S NAME:** Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME Better Nutritionals, LLC | | | |
|---|---|---|---|
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

| 1c. MAILING ADDRESS 3390 Horseless Carriage Drive | CITY Norco | STATE CA | POSTAL CODE 92860 | COUNTRY USA |
|---|---|---|---|---|

2. **DEBTOR'S NAME:** Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

3. **SECURED PARTY'S NAME** (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME Goli Nutrition Inc. | | | |
|---|---|---|---|
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

| 3c. MAILING ADDRESS 1 Westmount Square, Suite 1500 | CITY Montreal | STATE QC | POSTAL CODE H3Z 2P9 | COUNTRY CAN |
|---|---|---|---|---|

4. **COLLATERAL:** This financing statement covers the following collateral:
The assets listed on Schedule A hereto, which is incorporated herein by reference.

This filing is to provide notice that the assets listed on Schedule A hereto are the property of the Secured Party, and the Debtor is a bailee with respect to such assets, notwithstanding that they may be located on property owned or leased by the Debtor/bailee or its affiliates.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien  ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor  ☐ Consignee/Consignor  ☐ Seller/Buyer  ☑ Bailee/Bailor  ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA: 275173, 279178

PK2    849581-1

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

International Association of Commercial Administrators (IACA)

## Schedule A

### Collateral

### Smart Line 1 Equipment Description

| INVOICE # | SUPPLIER NAME | SERIAL # (IF APPLICABLE) | DESCRIPTION OF EQUIPMENT | QUANTITY |
|---|---|---|---|---|
| 3102020A | Anritsu Infivis | KD7483AFWH | 3" Pipeline X-Ray | 1 |
| 3102020B | Anritsu Infivis | F2SB5-02 | SUS Test Piece | 1 |
| 3102020B | Anritsu Infivis | 859U8825878 | Pump Stop Detector | 1 |
| 3102020B | Anritsu Infivis | 839H893510D | IP66 Modification | 1 |
| 3102020B | Anritsu Infivis | KD8013A-61 | Connector Set | 1 |
| 3102020B | Anritsu Infivis | AIUS | Lee Ball Valve Reject | 1 |
| 3102020B | Anritsu Infivis | KWS6205BP4K | SSVh Checkweigher | 4 |
| 3102020B | Anritsu Infivis | 84Y204604C | USB Memory 2GB | 4 |
| 3102020B | Anritsu Infivis | 84Y282257B | Top Poly Windshield | 4 |
| 3102020B | Anritsu Infivis | KW4132APBC | Dual Flipper Reject | 4 |
| 3102020B | Anritsu Infivis | 84Y211206C | Flipper Passline height change | 4 |
| 3102020B | Anritsu Infivis | AI | Reject Tray | 8 |
| 3102020B | Anritsu Infivis | 839H211140G | Rejection gates for tall products | 4 |
| INV 031820 | Auto-Mate | | AUTOMATE MODEL AM-500 HEAT INDUCTION FOIL SEALER | 4 |
| INV 031820 | Auto-Mate | | COMBINATION STALL/MISSING FOIL DETECTOR | 4 |
| INV 031820 | Auto-Mate | | COMBINATION FAULT LIGHT/AUDIBLE ALARM | 4 |
| INV 031820 | Auto-Mate | | GREEN/RED STACK LIGHT | 4 |
| INV 031820 | Auto-Mate | | S.S. FRAME UPCHARGE | 4 |
| INV 031820 | Auto-Mate | | 15' S.S. FREE STANDING CONVEYOR WITH S.S. LEGS (110V | 4 |
| INV 031820 | Auto-Mate | | PACKING FOR SHIPPING | 4 |
| INV 031820 | Auto-Mate | | REJECT SYSTEM (LESS TABLE) | 8 |
| INV 031820 | Auto-Mate | | REJECT TABLE | 8 |
| INV 031820 | Auto-Mate | | CONVEYOR SPEED MONITORING | 4 |
| INV 031820 | Auto-Mate | | CROOKED CAP DETECTION | 4 |
| INV 031820 | Auto-Mate | | TEMPERATURE MONITOR SYSTEM | 4 |
| INV 031820 | Auto-Mate | | MODEL CSM-4 CAP SEALING METER | 1 |
| 3092020 | Engage | TS-CH100-V1 | Neck Banding Machine | 4 |
| 3092020 | Engage | ET-GS75-V1 | Electric Shrink Tunnel | 4 |
| 3092020 | Engage | Additional Mandrels | Butterfly Mandrels | 4 |
| 3092020 | Engage | 4502351 | Spare Parts Kits | 4 |
| 3092020 | Engage | Crating | Crating Fee | 4 |
| 3092020 | Engage | Freight | LTL Freight Rate | 1 |
| 02056-1 | Fanuc | | FOUR ROBOTICS PKG & PALLETIZING SYSTEM | 1 |
| 68708-100 | Garvey | | BF48 Bi-Flo #1 | 4 |
| 68708-100 | Garvey | | Locally Mounted VFDs | 1 |
| 68708-100 | Garvey | | Freight | 1 |

B0933-8106 08/02/2022 5:00 PM Received by California Secretary of State

| | | | | |
|---|---|---|---|---|
| 62791 | Ketan | | TC-34M Hugger Belt Conveyor (For Use In Bottom Coding) | 4 |
| 62791 | Ketan | | X-Y Mast For Bottom Coder | 4 |
| 1002103385 | Keyence | MK-P4 | Console for MK-U | 4 |
| 1002103385 | Keyence | OP-87898 | Auto Shower Station | 6 |
| 1002103385 | Keyence | OP-35373 | Mounting Bracket | 4 |
| 1002103385 | Keyence | OP-73864 | Disconnect Cable | 4 |
| 1002103385 | Keyence | FS-N41C | Fiber Optic Sensor | 4 |
| 1002103385 | Keyence | FU-R67G | I09 Act Rec Guarded Tough | 4 |
| 1002103385 | Keyence | OP-87837 | Nozzle | 4 |
| 9283 | Mckenna | 400-09 | 50 HP McKenna Scotch Marine steam boiler. Built to the ASME "S" stamp code. Maximum working pressure 150 psig Equipped with Low Pressure Controls. Boiler will produce 1725 lbs of steam per hour. The boiler will have an SCAQMD rule 1146.2 precertified Low NOx Natural Gas burner (<20ppm) Burner Information: Model: Limpsfield | 2 |
| 9283 | Mckenna | 400-00-50 | Model 5472 McKenna feed water system. Including (1) 713 gallon make up tank with float valve and (2) turbine boiler feed pump. | 1 |
| 9283 | Mckenna | 400-16 | Steam sparge injector package | 1 |
| 9283 | Mckenna | 400-15 | Tank Insulation | 1 |
| 9283 | Mckenna | 400-16 | Stainless Steel Upgrade | 1 |
| 9283 | Mckenna | 400-00-19 | Model 2860 Code Blowdown Tank | 1 |
| 9284 | Mckenna | 400-09 | Steam boiler | 2 |
| 9284 | Mckenna | 400-00-50 | Feed water system | 1 |
| 9284 | Mckenna | 400-16 | Steam sparge injector package | 1 |
| 9284 | Mckenna | 400-15 | Tank Insulation | 1 |
| 9284 | Mckenna | 400-16 | Stainless Steel Upgrade | 1 |
| 9284 | Mckenna | 400-00-19 | Model 2860 Code Blowdown Tank | 1 |
| 13247-4r0 | PallayPack | | Twin Gummy Feeder & Conveyors: Line #1 | 1 |
| 13247-4r0 | PallayPack | | Twin Gummy Feeder & Conveyors: Line #2 | 1 |
| 13247-4r0 | PallayPack | | Twin Gummy Feeder & Conveyors: Line #3 | 1 |
| 13247-4r0 | PallayPack | | Twin Gummy Feeder & Conveyors: Line #4 | 1 |
| 78936 | OKI | | Superformer ST 1S case erectors | 4 |
| 78936 | OKI | | Supertaper ST1A automatic top tapers | 4 |
| 78936 | OKI | | M600 in-feed conveyors | 4 |
| 78936 | OKI | | Spare parts for SF1S | 1 |
| 78936 | OKI | | Spare parts for ST1A | 1 |
| 78936 | OKI | | Freight | 1 |
| FD20191123-5 | Sinofude | | FULL AUTOMATIC NEW DESIGN GUMMY CANDY PRODUCTION LINE CUSTOMIZED PER SPECIFICATIONS | 4 |
| SL200319 | Sourceline | 12700 | 2012 Sidel SBO 18 PET Universal/Matrix PET Reheat Stretch Blow Molding Machine | 1 |
| 20200310 | NJM | | Misc Machinery: Unisort32, Beltorque Capper, Labeler | 1 |
| 810080145 | Anton Paar | 157670 | Automatic Refractometer of the Heavy Duty Line | 1 |
| 810080145 | Anton Paar | 161832 | Sample Presser for measurement of solids | 1 |
| 810080145 | Anton Paar | 18318 | RheolabQC with standard stand | 1 |
| 810080145 | Anton Paar | P01079 | Anton Paar Service Visit | 1 |
| 810080145 | Anton Paar | 108642 | Peltier Temp Control System | 1 |

B0933-8107 08/02/2022 5:00 PM Received by California Secretary of State

| | | | | |
|---|---|---|---|---|
| 810080145 | Anton Paar | 20655 | Dispoable Measuring System | 1 |
| 810080145 | Anton Paar | 104632 | Rheometer Software | 1 |
| 144837559 | Crown | | RM6025-45MM-321, 18-125DL-15,FS3-MP344-3 | 1 |
| 144387558 | Crown | | PE4500-80 28X96 , 12-85DL-13 , FS3-MP344-2 | 1 |
| 50705 | iDry | | Food Vaccum | 1 |
| 39224 | Hunter Lab | | Acros Reflectance Spectrophotometer | 1 |
| 39224 | Hunter Lab | | On-Site Start-up Instrument Training | 1 |
| 39224 | Hunter Lab | | Performance Assurance | 1 |
| 654825774 | Mettler Toledo | | StaterPac Installation | 3 |
| 654825774 | Mettler Toledo | | StaterPac Installation | 5 |
| 654825774 | Mettler Toledo | | StaterPac Installation | 2 |
| 654825774 | Mettler Toledo | | IPAC Standard Qualification | 2 |
| 636400176 | Mettler Toledo | 30355485 | Balance XSR104 | 3 |
| 636400176 | Mettler Toledo | 30317127 | Balance XSR1202S | 5 |
| 636400176 | Mettler Toledo | 30317496 | Balance XSR1202S | 2 |
| 636400176 | Mettler Toledo | 30216103 | Hal. Moisture Analyzer HC103 (115V) | 2 |
| 636400176 | Mettler Toledo | 13865 | Aluminium sample pans | 1 |
| 636400176 | Mettler Toledo | 63053978 | Marble Slab (13 X20 X2 Thick) | 3 |
| 636400176 | Mettler Toledo | 63053973 | Damping Element | 12 |
| 636400176 | Mettler Toledo | 30550615 | CarePac OIML F2 5g/100g Cal | 1 |
| 636400176 | Mettler Toledo | 11123008 | CarePac 1000g F2 / 50g F2 Cal | 1 |
| 636400176 | Mettler Toledo | 11123011 | CarePac 5000g F2 / 200g F2 Cal | 1 |
| L20202 | RGL | | Lab Equipment Thermo Electron | 1 |
| L20202 | RGL | | Lab Equipment Fisher Scientific | 1 |
| AN140420 | RGL | | Clean Rooms Air Handling | 1 |
| AN140420 | RGL | | Clean Rooms Ceiling | 1 |
| AN140420 | RGL | | Clean Rooms Envelope System | 1 |
| AN140420 | RGL | | Clean Rooms Floor | 1 |
| V20014 | OTC | | Mould Washer | 1 |
| 102378 | Rotronic | | HC2-AW-USB Probe Set | 10 |

## Smart Line 2 Equipment

| Vendor / Manufacturer | Item | (Quantity) & Description |
|---|---|---|
| OTC Candy Equipment | | MANUFACTURING LINES |
| | 1. | (Complete Multi-component Production Line) SKU P1012 OTC Gel complete non Starch 1000 |
| | 2. | (Complete Multi-component Production Line) SKU P1017 Lab Line |
| SHANGHAI FUDE MACHINERY MANUFACTURING CO., LTD (aka Sinofude) | | MANUFACTURING LINES |
| | 1. | (6) Full Automatic New Design Gummy Candy Production Lines customized per specifications, kettles, carts and trays. |
| FORDS Packaging Systems Ltd | | CAPPING, SEALING, FEEDING SYSTEMS WITH APPLICABLE FORMAT CHANGES |
| | 1. | (Line 1) - Better Nutritionals Ref: B4-1(Fords ref 2008-5) |
| | 2. | (Line 2) - Better Nutritionals Ref: G-1  (Fords ref 2111-4) |
| | 3. | (Line 3) - Better Nutritionals Ref: B1-1(Fords ref 2112-4) |
| | 4. | (Line 4) - Better Nutritionals Ref: B1-2(Fords ref 2113-4) |
| | 5. | (Line 5) - Better Nutritionals Ref: B1-3(Fords ref 2114-4) |
| | 6. | (Line 6) - Better Nutritionals Ref: B2-1(Fords ref 2115-4) |
| | 7. | (Line 7) - Better Nutritionals Ref: B2-2(Fords ref TBA) |
| Crown Lift Trucks | | LIFT TRUCKS, BATTERIES, AND CHARGERS |
| | 1. | (8) Encore RM Series, Reach Trucks |
| | 2. | (8) V-Force Batteries |
| | 3. | (8) V-Force Chargers |
| | 4. | (8) Encore SC Series, Sit-Down Counterbalanced Trucks |
| | 5. | (8) V-Force Batteries |
| | 6. | (8) V-Force Chargers |
| | 7. | (2) Encore C5 Pneumatic, Internal Combustion Trucks |
| | 8. | (1) CGC45S-9 10,000 lb. Capacity, 4-Wheel, Internal Combustion Truck |
| | 9. | (4) Encore C5 Cushion, Internal Combustion Trucks |

B0933-8108 08/02/2022 5:00 PM Received by California Secretary of State

| Mettler Toledo | | WEIGHING BALANCES, PLATFORMS, INTERFACES, ANCILLARY EQUIPMENT |
|---|---|---|
| | 1. | (3) Balance XSR104 Product ID 30355485 |
| | 2. | (1) Balance XSR1202S Product ID 30317127 |
| | 3. | (4) Balance XSR6001S Product ID 30317496 |
| | 4. | (7) Hal. Moisture Analyzer HC103 (115V) Product ID 30216103 |
| | 5. | (15) Seven Excellence pH meter S400 Product ID 30046240 |
| | 6. | (15) pH electrode InLab Viscous Pro-ISM Product ID 51343151 |
| | 7. | (15) InLab cable MultiPin-BNC/RCA 1.2m Product ID 30281896 |
| | 8. | (3) Marble Slab (13 X20 X2 Thick) Product ID 63053978 |
| | 9. | (12) Damping Element Product ID 63053973 |
| | | ---------- |
| | 10. | (1) PC Electronic Box IND970 Product ID 30500816 COM 1-3 Interface, RS232 Interface, SICSpro Scale Interface |
| | 11. | (1) Human Machine Interface IND970 Product ID 30500815 |
| | 12. | (6) High Precision Platform PBK989 Product ID 30214791 |
| | 13. | (2) High Precision Platform PBK989 Product ID 30214791 |
| | 14. | (1) Cable M12 Ethernet-RJ45 5m Product ID 22017610 |
| | 15. | (2) Cable M12 USB type A 0.2m Product ID 22017604 |
| | 16. | (5) Terminal ICS4_9 Product ID 64087984 |
| | 17. | (1) DataLogic PowerScan PM9300 Wireless Barc Product ID 30097616 |
| | 18. | (1) Zebra ZD620 Direct Thermal Label Printer Product ID 30097616 |
| | 19. | (6) Cable M12-R/A Ethernet-RJ45 20.0m Product ID 22021091 |
| | | ---------- |
| | 20. | (8) High Precision Platform PBK989 Product ID 30214791 Model PBK989-AB15 |
| | 21. | (8) High Precision Platform PBK989 Product ID 30214791 Model PBK989-AB30 |
| | 22. | (8) High Precision Platform PBK989 Product ID 30214791 Base Model: PBK989 |
| | 23. | (10) Floor Scale PFD779 US11 Product ID 30405123 Model: PFD779 Load Cell SLB615D-2.2t C10 M12 Plug, Platform PFD779 SS 10K 60x60 |
| | 24. | (3) High Precision Platform PBK989 Product ID 30214791 Model PBK989-A3 |
| | 25. | (10) Weighing Terminal IND570 Product ID 30116716 |
| | 26. | (21) Human Machine Interface IND970 Product ID 30500815 |
| | 27. | (10) PC Electronic Box IND970 Product ID 30500816, COM 1-3 Interface, SICS-Scale-RS232 Interface [1] |
| | 28. | (8) PC Electronic Box IND970 Product ID 30500816, COM 1-3 Interface, SICSpro Scale Interface [3] |
| | 29. | (3) PC Electronic Box IND970 Product ID 30500816, COM 1-3 Interface, SICSpro Scale Interface [1] |
| | 30. | (21) Cable M12 Ethernet-RJ45 5m Product ID 22017610 |
| | 31. | (42) Cable M12 USB type A 0.2m Product ID 22017604 |
| | 32. | (10) Cable M12 RS232-SICS Scale Product ID 22017602 |
| | 33. | (21) DataLogic PowerScan Barcode Scanner Product ID 30097616 |
| | 34. | (21) Zebra Thermal Transfer Label Printer Product ID 30097616 |
| | 35. | (1) Software FOWN System Product ID 21901145 |
| | 36. | (1) License FOWN 21CFR part11 Product ID 21901147 |
| | 37. | (1) License FOWN Active substances Product ID 21901148 |
| | 38. | (3) License FOWN Master data management Product ID 21901153 |
| | 39. | (1) License FOWN Change order tool Product ID 21901157 |
| | 40. | (21) License FOWN Dispensing & production Product ID 21901167 |
| | 41. | (1) License FOWN ERP gateway / DB Product ID 21901164 |
| | 42. | (21) License FOWN ERP gateway per disp. st. Product ID 21901163 |
| | 43. | (1) License FOWN Stock function Product ID 21901150 |
| | 44. | (1) Doc. FOWN Validation volume 1 (EN) Product ID 21901220 |
| Lanner | 1. | (3) Smart Gateway SKU A-LEC-2580-711A-2A1 Fanless with O-Card-Wificard-WPEQ-261ACN(BT) |

B0933-8109 08/02/2022 5:00 PM Received by California Secretary of State

B0933-8110 08/02/2022 5:00 PM Received by California Secretary of State

| Southwest Warehouse Solutions | | VERTICAL LIFTS AND STORAGE, PUSH BACK SYSTEMS, & VEHICLE(S) |
|---|---|---|
| | 1. | (6) Modula Vertical Lift VLM Model ML50D-9,300 |
| | 2. | (2) Mechanical Straddles - Series 21 |
| | 3. | (1) 2021 Off – Highway Pro-Spotter 2017-B6.7 |
| Bull Sequana | 1. | Edge Server SKU M0-BES-UNIT-ATO Edge Server (Serial Number XAN-SE2-00299) |
| McKenna Boiler Works Inc. | | BOILERS, TANKS, PUMPS, AND ASSOCIATED EQUIPMENT |
| | 1. | (6) IT-00110 50 HP High-Pressure Scotch Marine Firetube Boiler |
| | 2. | (1) IT-00557 MODEL 4260 FEEDWATER TANK WITH MECHANICAL FLOAT AND VALVE |
| | 3. | (1) IT-00559 STEAM SPARGE INJECTOR PACKAGE |
| | 4. | (1) IT-00558 TANK INSULATION PACKAGE |
| | 5. | (1) IT-00339 Tank Insulation Package |
| | 6. | (1) IT-00549 MODEL 2860 MCKENNA ASME "U" STAMP CODE BLOWDOWN TANK |
| | 7. | (3) IT-00404 NV Vertical Booster 12/12 304SS/EPDM 2HP 230/460V 3PH TEFC 60Hz |
| Atlas Copco Compressors LLC | | COMPRESSSED AIR EQUIPMENT |
| | 1. | (1) 8150036200 ZH500-150-60 Model ZH500-150 Plus packaged three-stage centrifugal air compressor |
| | 2. | (1) 8102199265 FD+1750-WC - 460/3/60 FD1750+-WC Water-Cooled Saver-Cycle Refrigerated Dryer |
| | 3. | (1) 8154000412 ZT90VSD STD- P-8.6-60-460V oil-free LP air compressor |
| | 4. | (1) 8154000412 ZT90VSD STD-P-8.6-60-460V oil-free LP air compressor |
| | 5. | (1) 8154000641 ZR160VSD+-P-10.4-60-460V  oil-free LP air compressor |
| | 6. | (1) 8102044008 EWD 1500C NPT 110V |
| | 7. | (1) 8102194109 FD310VSD-A-460-NPT Air-Cooled Saver Cycle Refrigerated Dryer |
| | 8. | (1) 8102194109 FD310VSD-A-460-NPT Air-Cooled Saver Cycle Refrigerated Dryer |
| | 9. | (2) 8102297903 FILTER UD310+ (NPT 2 1/2) Coalescing Filter |
| | 10. | (1) 8102121162 PD+ 1800F ASME W/115V DRAIN Coalescing Filter |
| | 11. | (1) 1280567300 LV3800-150 3,800Gal. 150PSI ASME Vertical Receiver |
| | 12. | (1) 1280014705 CE-320-307 Closed Loop Cooling System |
| RGL Management, LLC | 1. | (Multiple) Warehouse racks (3rd party manufacturer). |
| PPM Technology Holdings LLC | | CONVEYORS AND ASSOCIATED WORKSTATIONS, CONTROL PANELS, & EQUIPMENT |
| | 1. | (7) 4340 / PPM Technologies Straight Belt Conveyors |
| | 2. | (7) 4340 / PPM Technologies Incline Belt Conveyors |
| | 3. | (7) 4713 / EZ Swap Oil Drums |
| | 4. | (7) 4716 / PPM Flavorite Belt Workstations |
| | 5. | (7) 4756 / PPM Technologies Mini VF Conveyors |
| | 6. | (1) 4390 / Control Panel – Pre-wired |

| Keyence Corporation of America | | BOTTLE IMAGING EQUIPMENT |
|---|---|---|
| | 1. | (10) MK-G1000PY Industrial Inkjet Printer Yellow Ink Model |
| | 2. | (10) MK-P5 Console for MK-G Series |
| | 3. | (10) MK-D1A Dock for MK-G Series |
| | 4. | (10) MK-B1W Backup Module for MK-G Series |
| | 5. | (5) MK-C1 Monitoring Unit for MK-G Series |
| | 6. | (5) MK-KY2H Yellow Ink Incl. 2 cartridges of MK-30 pcs |
| | 7. | (4) MK-S04 Standard Solvent 4 cartridges of MK-20 Solvent |
| | 8. | (2) MK-S02C Standard Solvent for Cleaning 2 catrg of MK-20 clean fluid set |
| | 9. | (10) OP-35373 Mounting Bracket for MK |
| | 10. | (10) OP-77251 AC Cable for USA/Canada |
| | 11. | (4) OP-87837 Nozzle for MK (PY/PW) |
| | 12. | (10) OP-78632 Trigger Mounting Bracket for MK |
| | 13. | (10) OP-73864 Standard Quick Disconnect Cable M8, 4-pin, 2m length |
| | 14. | (10) OP-23980 Additional Component Mounting Bracket for FU Series |
| | 15. | (10) FS-N41C Fiber Optic Sensor Amp: M8 QD, Main, PNP/NPN, IO-Link |
| | 16. | (10) FU-R67G I09 Act. Rec., Guarded Tough-Flex 1M |
| American Covers Inc. | 1. | (2) CT404021 Storage Container Cover - High Profile |
| Dura-Ramp Inc. | 1. | (1) (DR-M30) Dura-Ramp Mobile Portable Steel Loading Dock |

B0933-8111  08/02/2022  5:00 PM  Received by California Secretary of State

B0933-8112 08/02/2022 5:00 PM Received by California Secretary of State

## Dell Equipment

| | | | |
|---|---|---|---|
| Dell | 210-AQUB | PowerEdge R340 Server | 536KM83 |
| Dell | 210-AQUB | PowerEdge R340 Server | 537MM83 |
| Dell | 210-AQUB | PowerEdge R340 Server | 53CJM83 |
| Dell | 210-AQUB | PowerEdge R340 Server | 53DGM83 |
| Dell | 210-AQUB | PowerEdge R340 Server | 53LHM83 |
| Dell | ES6-PS-SW25GB-BE | EX300/500 Switch SW25GB HA Back End | APM01205102488 |
| Dell | ES6-PS-SW25GB-BE | EX300/500 Switch SW25GB HA Back End | APM01205102489 |
| Dell | ES6-PS-SW25GB-FE | EX300/500 Switch SW25GB Front End | APM01205102490 |
| Dell | ES6-PS-SW25GB-FE | EX300/500 Switch SW25GB Front End | APM01205102491 |
| Dell | ES6-QS-SVP-192T-16 | EX500 Perf Node 12x16TB | APM01205105641 |
| Dell | ES6-QS-SVP-192T-16 | EX500 Perf Node 12x16TB | APM01205105642 |
| Dell | ES6-QS-SVP-192T-16 | EX500 Perf Node 12x16TB | APM01205105643 |
| Dell | ES6-QS-SVP-192T-16 | EX500 Perf Node 12x16TB | APM01205105644 |
| Dell | ES6-QS-SVP-192T-16 | EX500 Perf Node 12x16TB | APM01205105645 |
| Dell | ES6-PS-SW25GB-FE | EX300/500 Switch SW25GB Front End | BSU00204101575 |
| Dell | ES6-PS-SW25GB-FE | EX300/500 Switch SW25GB Front End | BSU00204101590 |
| Dell | ES6-QS-SVP-192T-16 | EX500 Perf Node 12x16TB | BSU00204503889 |
| Dell | ES6-QS-SVP-192T-16 | EX500 Perf Node 12x16TB | BSU00204503890 |
| Dell | ES6-QS-SVP-192T-16 | EX500 Perf Node 12x16TB | BSU00204503891 |
| Dell | ES6-QS-SVP-192T-16 | EX500 Perf Node 12x16TB | BSU00204503892 |

B0933-8113 08/02/2022 5:00 PM Received by California Secretary of State

| Dell | ES6-QS-SVP-192T-16 | EX500 Perf Node 12x16TB | BSU00204503893 |
|------|--------------------|--------------------------|----------------|
| Dell | ES6-QS-SVP-192T-16 | EX500 Perf Node 12x16TB | BSU00204503898 |
| Dell | ES6-QS-SVP-192T-16 | EX500 Perf Node 12x16TB | BSU00204503902 |
| Dell | ES6-QS-SVP-192T-16 | EX500 Perf Node 12x16TB | BSU00204503912 |
| Dell | ES6-QS-SVP-192T-16 | EX500 Perf Node 12x16TB | BSU00204503916 |
| Dell | ES6-QS-SVP-192T-16 | EX500 Perf Node 12x16TB | BSU00204503918 |
| Dell | ES6-QS-SVP-192T-16 | EX500 Perf Node 12x16TB | BSU00204503931 |
| Dell | ES6-QS-SVP-192T-16 | EX500 Perf Node 12x16TB | BSU00204503932 |
| Dell | ES6-QS-SVP-192T-16 | EX500 Perf Node 12x16TB | BSU00204503933 |
| Dell | ES6-QS-SVP-192T-16 | EX500 Perf Node 12x16TB | BSU00204503940 |
| Dell | ES6-QS-SVP-192T-16 | EX500 Perf Node 12x16TB | BSU00204503946 |
| Dell | ES6-QS-SVP-192T-16 | EX500 Perf Node 12x16TB | BSU00204503954 |
| Dell | ES6-QS-SVP-192T-16 | EX500 Perf Node 12x16TB | BSU00204503959 |
| Dell | ES6-QS-SVP-192T-16 | EX500 Perf Node 12x16TB | BSU00204503962 |
| Dell | ES6-QS-SVP-192T-16 | EX500 Perf Node 12x16TB | BSU00204503964 |
| Dell | ES6-QS-SVP-192T-16 | EX500 Perf Node 12x16TB | BSU00204503967 |
| Dell | ES6-PS-SW25GB-BE | EX300/500 Switch SW25GB HA Back End | BSU00204504613 |
| Dell | ES6-PS-SW25GB-BE | EX300/500 Switch SW25GB HA Back End | BSU00204504621 |
| Dell | ES6-10GB-SR | Module 10GB SR | DSN001-9003277-020-01 |
| Dell | M-PSM-HW-IS2-1Y | PROSUPPORT 4HR/MC HARDWARE SUPPORT-1 YR | DSN001-9003277-020-02 |
| Dell | PS-PDAD-ECS3CANIN | PD AddOn, for ECS Add One 2U Node | DSN001-9003277-020-03 |
| Dell | PS-PD-ECSEX300DP | PD for ECS 2U | DSN001-9003277-020-04 |
| Dell | 210-ALZH | PowerEdge R540 Server | FDF6773 |

| | | | |
|---|---|---|---|
| Dell | 210-ALZH | PowerEdge R540 Server | FDF6G73 |
| Dell | 210-ALZH | PowerEdge R540 Server | FDF7773 |
| Dell | 210-ALZH | PowerEdge R540 Server | FDF7G73 |
| Dell | 210-ALZH | PowerEdge R540 Server | FDF8773 |
| Dell | 210-ALZH | PowerEdge R540 Server | FDF8G73 |
| Dell | 210-ALZH | PowerEdge R540 Server | FDF9773 |
| Dell | ES6-QS-SVP-192T-16 | EX500 Perf Node 12x16TB | N42BS9L |
| Dell | ES6-QS-SVP-192T-16 | EX500 Perf Node 12x16TB | N42BSJ5 |
| Dell | ES6-PS-SW25GB-FE | EX300/500 Switch SW25GB Front End | N42BSKR |
| Dell | ES6-PS-SW25GB-FE | EX300/500 Switch SW25GB Front End | N43A90X |
| Dell | ES6-PS-SW25GB-BE | EX300/500 Switch SW25GB HA Back End | N43AAR6 |
| Dell | ES6-PS-SW25GB-BE | EX300/500 Switch SW25GB HA Back End | N43AAXG |
| Dell | ES6-QS-SVP-192T-16 | EX500 Perf Node 12x16TB | N43AXHG |
| Dell | ES6-QS-SVP-192T-16 | EX500 Perf Node 12x16TB | N43AXJN |
| Dell | ES6-QS-SVP-192T-16 | EX500 Perf Node 12x16TB | N43AXXE |
| Dell | ES6-PS-RACK | Rack EX300/500 Single Phase | SA7SM204000020 |

B0933-8114 08/02/2022 5:00 PM Received by California Secretary of State

# EXHIBIT 7

# ARAMARK SETTLEMENT
# (REDACTED)

DocuSign Envelope ID: 93EC8C55-028C-433C-B80A-A4598E331E30

## CONFIDENTIAL SETTLEMENT AGREEMENT AND MUTUAL RELEASE

This Confidential Settlement Agreement and Mutual Release ("Release") is made and entered into this 10th day of October, 2022, by and between Aramark Services, Inc., a Delaware corporation, on the one hand, and Better Nutritionals, LLC, a California limited liability company, on the other hand. The aforementioned parties to this Release shall hereinafter be referred to collectively as the "Parties" and each as a "Party."

## DEFINITIONS

**Aramark**:  For purposes of this Release, the term "Aramark" shall mean Aramark Services, Inc. and any of its respective past, present or future parent or subsidiary corporations, affiliates, divisions, predecessors, successors, administrators, assigns, insurers, underwriters, agents, officers, board members, trustees, receivers, custodians, directors, partners, shareholders, employees, attorneys and all parties in privity therewith.

**Better Nutritionals**:  For purposes of this Release, the term "Better Nutritionals" shall mean Better Nutritionals, LLC and any of its respective past, present or future parent or subsidiary corporations, affiliates, divisions, predecessors, successors, administrators, assigns, insurers, underwriters, agents, officers, board members, trustees, receivers, custodians, directors, partners, shareholders, employees, attorneys and all parties in privity therewith.

## RECITALS

WHEREAS, Aramark is in the business of providing, among other things, food management services;

WHEREAS, pursuant to that certain Food Services Agreement, effective March 25, 2021 (the "Agreement"), Aramark provided certain food services to Better Nutritionals (collectively, the "Services");

DocuSign Envelope ID: 93EC8C55-028C-433C-B80A-A4598E331E30

WHEREAS, Aramark asserts that it provided the Services to Better Nutritionals as required by the Agreement;

WHEREAS, Aramark invoiced Better Nutritionals for the Services it performed in accordance with the Agreement (the "Invoices");

WHEREAS, Aramark alleges that Better Nutritionals breached the Agreement by failing to remit to Aramark certain monies owed under the Invoices (the "Outstanding Receivable");

WHEREAS, in an effort to avoid the uncertainties and costs of protracted litigation, the Parties now desire and intend to resolve any and all disputes between them.

NOW, THEREFORE, in consideration of the promises, agreements and releases contained herein, the legal sufficiency of which is hereby acknowledged by the Parties, and intending to be legally bound, the Parties now agree as follows:

2

2.    **Compromise/No Admissions.**    This Release is expressly agreed to be in compromise of disputed claims between the Parties and is intended to avoid the time, cost and uncertainty of litigation.  This Release shall not be construed as an admission by any of the Parties of any liability or wrongdoing of any nature whatsoever.

3.    **Settlement Payments.**

a.    In full and final payment of any and all amounts that either of the Parties may claim due pursuant to, arising out of and/or relating in any way to the Agreement, the Services, the Invoices and/or the Outstanding Receivable, and in consideration of the mutual releases set forth herein, Better Nutritionals, shall pay to Aramark the sum of one million, four hundred seventy-two thousand, nine hundred eighty-two and 36/100 US dollars ($1,472,982.36 (the "Settlement Sum"). Payment of the Settlement Sum shall be made as follows:

DM1\13530729.1

7.    <u>**Grant of Security Interest.**</u>  Subject to the terms of this Agreement and to secure the (i) the Settlement Sum, and (ii) all costs and expenses incurred in connection with enforcement and collection of the Secured Obligations described in the foregoing clause (i), including, without limitation, reasonable attorneys' fees and disbursements (collectively, the "**Secured Obligations**"), Better Nutritionals hereby pledges, assigns, grants, conveys and transfers to Aramark, a security interest (the "**Security Interest**") in, and a right to set off against, any and all of its right, title and interest in, to and under the following, whether now owned, acquired or arising hereafter (the "**Collateral**")[1]:

a.    all Accounts, cash and currency, including Accounts Receivables;

b.    all Chattel Paper, including without limitation, Tangible Chattel Paper and Electronic Chattel Paper; all Documents, all Instruments (including Promissory Notes), all Investment Property, all Letter-of-Credit Rights and all Supporting Obligations;

---

[1] Capitalized terms used in this Paragraph 7 shall have the meanings assigned thereto in the Uniform Commercial Code in effect in the State of California.

DM1\13530729.1

DocuSign Envelope ID: 93EC8C55-028C-433C-B80A-A4598E331E30

c.      all General Intangibles (including Deposit Accounts) and all rights of Better Nutritionals in, to and under all Payment Intangibles, patents, patent licenses, trademarks, trademark licenses, trade names, copyrights, copyright licenses, Software, techniques, processes, formulas, know how or other intellectual property, and licenses thereof;

d.      all rights of Better Nutritionals in, to and under all permits, authorizations, approvals, registrations, licenses, approvals, certificates of convenience or necessity, franchises, immunities, easements, consents, grants, ordinances or other rights granted by any Governmental Authority;

e.      all rights of Better Nutritionals in and to all books, records, writings, databases (electronic or otherwise), information and other property relating to, used or useful in connection with, or evidencing, embodying, incorporating or referring to, any of the foregoing;

f.      all rights of Better Nutritionals in, to or under (i) all sales orders, sales contracts, purchase orders, purchase contracts, operating agreements, management agreements, service agreements, development agreements, consulting agreements and leases, and (ii) all other contract rights, General Intangibles and, to the extent they can lawfully be conveyed or assigned, under express or implied warranties from providers of goods or services;

g.      all Equipment, Goods and Inventory, and (whether or not included in such definitions) all tangible personal property, now owned or hereafter acquired by Better Nutritionals, including, without limitation, (i) all research, storage or office equipment, computer hardware and software, machinery, chattels, tools, parts,

8

machine tools, furniture, furnishings, fixtures and supplies, of every nature, wherever located, and (ii) all conditions, accessories and improvements to any equipment and all substitutions therefor and all accessories, parts and equipment which may be attached to or which are necessary for the operation and use of any equipment, personal property or fixtures, together with all accessions thereto;

h.    all rights of Better Nutritionals in, to and under all products, Accessions, rents, issues, profits, returns, income and Proceeds of any and all Collateral and to the extent not otherwise included, all rights of Better Nutritionals in, to and under all payments under insurance or any indemnity, warranty or guaranty payable by reason of any loss or damage to any Collateral or otherwise with respect to any of the Collateral;

i.    all rights of Better Nutritionals in, to and under all moneys and securities;

j.    all books and records evidencing or relating to the foregoing, including, without limitation, billing records of every kind and description, customer lists, data storage and processing media, Software and related material, including computer programs, computer tapes, cards, disks and printouts, and including any of the foregoing which are in the possession of any affiliate or any computer service bureau; and

k.    Proceeds of the above Collateral.

IN WITNESS WHEREOF, the Parties hereto intending to be legally bound hereby set their names and have hereby executed this Confidential Settlement Agreement and Mutual Release on the date indicated below.

**ARAMARK SERVICES, INC.**

By: _Richard Zakrzwski_                         Date: 10/11/2022
_____              _____

Name: Richard Zakrzwski
_____

Title: Vice President of Finance
_____


**BETTER NUTRITIONALS, LLC**

By: _Sharon Hoffman_                           Date: 10/10/2022
_____              _____

Name: Sharon Hoffman

Title:  CEO

13

EXHIBIT 8

UCC-1 FILED BY ARAMARK


U220234295329



**STATE OF CALIFORNIA**
*Office of the Secretary of State*
**UCC FINANCING STATEMENT (UCC 1)**
California Secretary of State
1500 11th Street
Sacramento, California 95814
(916) 653-3516

| For Office Use Only |
|---|
| **-FILED-** |
| File No.: U220234295329 |
| Date Filed: 10/11/2022 |

Submitter Information:

| | |
|---|---|
| Contact Name | Jonathan Swichar, Esq. |
| Organization Name | Duane Morris LLP |
| Phone Number | (215) 979-1816 |
| Email Address | JLSwichar@duanemorris.com |
| Address | 30 SOUTH 17TH STREET |
| | PHILADELPHIA, PA 19103 |

Debtor Information:

| Debtor Name | Mailing Address |
|---|---|
| Better Nutritionals, LLC | 3390 Horseless Carriage Drive<br>Norco, CA 92860 |

Secured Party Information:

| Secured Party Name | Mailing Address |
|---|---|
| Aramark Services, Inc. | 2400 Market Street<br>Philadelphia, PA 19103 |

Indicate how documentation of Collateral is provided:
Entered as Text

Description:
All assets of the Debtors now owned or hereafter acquired.

Indicate if Collateral is held in a Trust or is being administered by a Decedent's Personal Representative:
Not Applicable

Select an alternate Financing Statement type:
Not Applicable

Select an additional alternate Financing Statement type:
Not Applicable

Select an alternative Debtor/Secured Party designation for this Financing Statement:
Not Applicable

Optional Filer Reference Information:

Miscellaneous Information:

Search to Reflect:

☐ Order a Search to Reflect

EXHIBIT 9

JL-1 FILED BY SUITABLE STAFFING



U220240284131



**STATE OF CALIFORNIA**
*Office of the Secretary of State*
**NOTICE OF JUDGMENT LIEN (JL 1)**
California Secretary of State
1500 11th Street
Sacramento, California 95814
(916) 653-3516

For Office Use Only

## -FILED-

File No.: U220240284131

Date Filed: 11/1/2022

---

Submitter Information:

| | |
|---|---|
| Contact Name | Marshall J. August |
| Organization Name | FRANDZEL ROBINS BLOOM & CSATO, L.C. |
| Phone Number | (323) 852-1000 |
| Email Address | maugust@frandzel.com |
| Address | 1000 WILSHIRE BLVD., 19TH FLOOR LOS ANGELES, CA 90017 |

Judgment Debtor Information:

| Judgment Debtor Name | Mailing Address |
|---|---|
| Better Nutritionals, a California limited liability company | 3380 Horseless Carriage Drive Norco, CA 92860 |

Judgment Creditor Information:

| Judgment Creditor Name | Mailing Address |
|---|---|
| Suitable Staffing Solutions, a California corporation | 801 W. Victoria Street Suite A-1 Compton, CA 90220 |

Judgment Information:

| | |
|---|---|
| A. Name of Court Where Judgment Was Entered | Superior Court of the State of California, County of Los Angeles, Central District |
| B. Title of the Action | Suitable Staffing Solutions, a California corporation v. Better Nutritionals, a California limited liability company |
| C. Case Number | 22STCV21235 |
| D. Date Judgment Was Entered | 10/05/2022 |

| E. Date(s) of Subsequent Renewal of Judgment (if any) |
|---|
| None Entered |

| | |
|---|---|
| F. Date of This Notice | 11/01/2022 |
| G. Amount Required to Satisfy Judgment at This Date of Notice | $2,228,898.03 |

---

All property subject to enforcement of a Money Judgment against the Judgment Debtor to which a Judgment Lien on personal property may attach under Section 697.530 of the Code of Civil Procedure is subject to this Judgment Lien.

---

Declaration and Signature:

Declaration:                                         I am the Attorney of Record for the Judgment Creditor.

☒ I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

---

*Marshall J. August*                                   *11/01/2022*

Sign Here                                             Date

B1219-9237 11/01/2022 3:21 PM Received by California Secretary of State

# EXHIBIT 10

# HOFFMAN PROMISSORY NOTE
# AND SECURITY AGREEMENT

Case 6:22-bk-14723-MH   Doc 14   Filed 12/20/22   Entered 12/20/22 10:27:41   Desc
Main Document    Page 94 of 102

## SECURED PROMISSORY NOTE

$600,000.00                                                          Norco, California
                                                                December 19, 2022

     FOR VALUE RECEIVED, Better Nutritionals, LLC, a California limited liability company ("**Borrower**"), whose address is 3390 Horseless Carriage Drive, Norco, California 92860, hereby promises to pay to the order of Sharon and Odelya Hoffman (collectively "**Lender**"), the principal sum of six hundred thousand dollars ($600,000.00) in lawful money of the United States of America, together with interest as provided herein.

     1.    <u>Maturity Date</u>.  This Note shall mature, and all principal and interest is due and payable in full, on January 3, 2033 (the "**Maturity Date**").

     2.    <u>Interest</u>.  From and after the date hereof, all outstanding principal of this Note shall bear simple interest at the fixed rate of nine percent (9.0%) per annum.  If Borrower defaults on any term hereof, all outstanding principal of this Note shall bear simple interest at the rate of eleven percent (11.0%) per annum until the principal balance is paid in full or the default has been cured.  Interest shall be calculated based on a 360-day year with 30-day months.

     3.    <u>Payments</u>.

     (a)    An interest-only payment in the amount of six thousand dollars ($6,000.00) shall be paid on February 1, 2023.

     (b)    Interest-only payments in the amount of four thousand five hundred dollars ($4,500.00) shall be paid monthly on the first day of the month, beginning with the first payment on March 1, 2023, and continuing thereafter until January 1, 2024.

     (c)    Payments of principal and interest in the amount of eight thousand one hundred twenty-five and 75/100 dollars ($8,125.75) shall be paid monthly on the first business day of the month, beginning with the first payment of principal and interest on February 1, 2024, and continuing thereafter until January 1, 2033.

     4.    <u>Late fee</u>.  If any payment is not made by the tenth day of the month, Borrower shall pay a late fee equal to five percent (5.0%) of such payment.

     5.    <u>Security</u>.  As security for the payment of Borrower's obligations under this Note, Lender and Borrower have entered into that certain Security Agreement of even date herewith (the "**Security Agreement**").  Lender and Borrower have agreed that all obligations under this Note shall be secured by all of the Collateral (as that term is defined in the Security Agreement) of Borrower.

     6.    <u>Prepayment</u>.  Borrower may prepay this Note prior to the Maturity Date without premium or penalty.

1700050.1  27111                              1

7.    <u>Events of Default</u>.  The occurrence of any one or more of the following events shall constitute an "**<u>Event of Default</u>**" under this Note:

(a)    the failure of Borrower to pay any sum due under this Note when due, whether by demand or otherwise, and such sum remains unpaid for five (5) business days after the due date; and

(b)    any other Event of Default described in the Security Agreement.

8.    <u>Remedies</u>.  At such time that an Event of Default has occurred and is continuing, then Lender, by written notice to Borrower (a "**<u>Notice</u>**"), may declare all amounts hereunder immediately due and payable in cash and Lender shall be entitled to reimbursement of its reasonable costs and expenses (including reasonable attorneys' fees and costs) related to collection of all amounts owing in connection thereof.  Except for the Notice, Lender need not provide, and Borrower hereby waives, any presentment, demand, protest or other notice of any kind, and Lender may immediately and without expiration of any grace period enforce any and all of its rights and remedies hereunder and all other remedies available to it under applicable law.  Such election may be rescinded and annulled by Lender at any time prior to payment hereunder.  No such rescission shall affect any subsequent Event of Default or impair any right consequent thereon.

9.    <u>Maximum Rate of Interest</u>.  Notwithstanding any provision of this Note to the contrary, Borrower shall not be obligated to pay interest under this Note in excess of the maximum rate of interest permitted by the laws of any state determined to govern this Note or the laws of the United States applicable to loans in such state.  If any provision of this Note shall ever be construed to require the payment of any amount of interest in excess of that permitted by applicable law, then the interest to be paid under this Note shall be held subject to reduction to the amount allowed under applicable law and any sums paid in excess of the interest rate allowed by law shall be applied in reduction of the principal balance outstanding under this Note.

10.    <u>Choice of Law</u>.  This Note shall be governed by and construed in accordance with the laws of the State of California, without regard to choice of law principles of the State of California.  Borrower submits to the jurisdiction and venue of Riverside County, California, for any legal proceeding to enforce this Note.

11.    <u>Notices</u>.  Any and all notices or other communications or deliveries required or permitted to be provided hereunder shall be in writing and shall be deemed given and effective on the earliest of (a) the date of transmission if such notice or communication is delivered by facsimile prior to 5:00 p.m. (Pacific Time) on a business day, (b) the next business day after the date of transmission if such notice or communication is delivered via facsimile on a day that is not a business day or later than 5:00 p.m. (Pacific Time) on a business day, (c) the second business day after the date of mailing if sent by U.S. nationally recognized overnight courier service, or (d) upon actual receipt by the party to whom such notice is required to be given.

IN WITNESS WHEREOF, Borrower has duly executed this Note as of the day and year first hereinabove set forth.

"BORROWER"

BETTER NUTRITIONALS, LLC, a California limited liability company

By Sharon Hoffman
Its Manager and Chief Executive Officer

## SECURITY AGREEMENT

This Security Agreement ("**Security Agreement**") dated December 19, 2022, is entered into by Better Nutritionals, LLC, a California limited liability company ("**Borrower**"), and Sharon and Odelya Hoffman (collectively "**Lender**").  Borrower and Lender are collectively referred to herein as the "**Parties**."

## RECITALS

A.      Borrower has executed a *Secured Promissory Note* (the "**Note**"), relating to a loan made by Lender to Borrower in the amount of $600,000 (the "**Loan**").

B.      As security for Borrower's obligations to Lender under the Note, Borrower has agreed to grant Lender a security interest in all of its assets.

## AGREEMENT

For other good and valuable consideration, the receipt of which is hereby acknowledged, the Parties agree as follows:

1.      Recitals Acknowledged.  Each of the Parties acknowledges that, to the best of the Party's knowledge, each of the above recitals is true and correct in every material respect.

2.      Security Interest in Collateral.  To secure payment of any and all indebtedness, liabilities and obligations of Borrower to Lender under the Note, Borrower unconditionally and irrevocably assigns, pledges and grants to Lender a continuing security interest and lien in and to all present and future right, title and interest of Borrower in the following property of Borrower, wherever located, whether now owned or existing or hereafter acquired (collectively the "**Collateral**"):

    (a)      accounts, including receivables;

    (b)      chattel paper, whether tangible or electronic;

    (c)      commercial tort claims;

    (d)      deposit accounts;

    (e)      documents;

    (f)      equipment;

    (g)      fixtures;

(h)    general intangibles, including payment intangibles, patents, patent applications, trademarks, trademark applications, tradenames, copyrights, copyright applications, software, engineering drawings, service marks, customer lists, goodwill and all licenses, permits, agreements of any kind or nature pursuant to which Borrower possesses or uses or has authority to possess or use property (whether tangible or intangible) of others or others possess, use or have authority to possess or use property (whether tangible or intangible) of Borrower, and all recorded data of any kind or nature, regardless of the medium of recording, including all software, writings, plans, specifications, and schematics;

(i)    goods;

(j)    instruments, including promissory notes;

(k)    inventory;

(l)    investment property;

(m)    letter-of-credit rights;

(n)    negotiable documents;

(o)    payment intangibles;

(p)    securities;

(q)    all rights of Borrower embodied in or arising out of Borrower's status as a member of any limited liability company, consisting of (i) all economic rights, including all rights to share in the profits and losses of the limited liability company and all rights to receive distributions of the assets of the limited liability company, and (ii) all governance rights, including all rights to vote, consent to action, and otherwise participate in the management of the limited liability company;

(r)    all substitutions, replacements and accessions to any of the foregoing; and

(s)    all proceeds and products of any of the foregoing.

3.    <u>Authority to File Financing Statements</u>.  Borrower hereby irrevocably authorizes Lender at any time and from time to time to file in any filing office in any Uniform Commercial Code jurisdiction any initial financing statements and amendments thereto that indicate the Collateral (a) as all assets of Borrower or words of similar effect, regardless of whether any particular asset comprised by the Collateral falls within the scope of Article 9 of the Uniform Commercial Code of the state or such jurisdiction, or (b) as being of an equal or lesser scope or with greater detail.

4.      <u>Rights and Remedies</u>.

(a)      The rights, powers, and remedies of Lender under this Security Agreement shall be in addition to all rights, powers, and remedies given to Lender by virtue of any statute or rule of law, the Note, and any other document evidencing the terms of the Loan, all of which rights, powers, and remedies shall be cumulative and may be exercised successively or concurrently without impairing Lender's security interest in the Collateral.

(b)      If an event of default shall have occurred and be continuing, Lender, without any other notice to or demand upon Borrower, shall have in any jurisdiction in which enforcement hereof is sought, in addition to all other rights and remedies, the rights and remedies of a secured party under the Uniform Commercial Code of the State of California and any additional rights and remedies as may be provided to a secured party in any jurisdiction in which Collateral is located, including, without limitation, the right to take possession of the Collateral, and for that purpose Lender may, so far as Borrower can give authority therefor, enter upon any premises on which the Collateral may be situated and remove the same therefrom.

(c)      Lender may in its discretion require Borrower to assemble all or any part of the Collateral at such location or locations within the jurisdiction(s) of Borrower's principal office(s) or at such other locations as Lender may reasonably designate.

(d)      Unless the Collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, Lender shall give to Borrower at least five business days prior written notice of the time and place of any public sale of Collateral or of the time after which any private sale or any other intended disposition is to be made.  Borrower hereby acknowledges that five business days prior written notice of such sale or sales shall be reasonable notice.

(e)      Borrower waives any and all rights that it may have to a judicial hearing in advance of the enforcement of any of Lender's rights and remedies hereunder, including, without limitation, its right following an event of default to take immediate possession of the Collateral and to exercise its rights and remedies with respect thereto.

5.      <u>No Waiver</u>.  Any waiver of or acquiescence in any default by Borrower, or failure of Lender to insist upon strict performance by Borrower of any warranties or agreements in the Note or this Security Agreement, shall not constitute a waiver of any subsequent or other default or failure, except as provided otherwise at law or in equity.

6.      <u>Miscellaneous Provisions</u>.

(a)      <u>Successors and Assigns</u>.  This Security Agreement is binding upon and shall inure to the benefit of the Parties hereto, and their respective attorneys, agents, heirs, administrators, predecessors, successors and assigns.

(b)      <u>Severability</u>.  If any portion of this Security Agreement is found to be void, voidable or unenforceable at law, the remaining terms and conditions of this Security Agreement may be enforced.

      (c)    <u>Governing Law</u>. This Security Agreement shall be governed by and construed in accordance with the laws of the State of California, without regard to choice of law principles of the State of California. Unless the context clearly indicates otherwise, terms used in this Security Agreement that are defined in the Uniform Commercial Code will have the meanings ascribed to them in the Uniform Commercial Code as the same may be from time to time in effect in the state of California.

      (d)    <u>Further Assurances</u>. Each Party to this Security Agreement shall execute all instruments and documents and take all actions as may be reasonably required to effectuate the purpose of this Security Agreement.

      (e)    <u>Modification</u>. This Security Agreement may be modified only by a writing executed by the Party to this Security Agreement against whom enforcement of such modification is sought.

      (f)    <u>Interpretation</u>. This Security Agreement has been negotiated at arms' length, and between persons sophisticated and knowledgeable in matters dealt with in this Security Agreement. Accordingly, any rule of law, statute, legal decision or common law principle that would require interpretation of any ambiguities in this Security Agreement against the Party that has drafted it is not applicable, and is waived. The provisions of this Security Agreement shall be interpreted in a reasonable manner to effect the purpose and intent of this Security Agreement.

      (g)    <u>Authority to Sign</u>. The person signing below on behalf of each Party, and each Party, represents that the signing person has the authority to execute this Security Agreement on behalf of said Party, and that it is not necessary for any other Party to inquire further into the validity of execution or authority to execute.

      (h)    <u>Counterparts</u>. Each Party may sign a facsimile copy of this Security Agreement, in counterparts, with the same effect as if each Party had signed an original of the same document.


"BORROWER"                                                "LENDER"

BETTER NUTRITIONALS, LLC, a California
limited liability company

_____            _____
By Sharon Hoffman                                          Sharon Hoffman, an individual
Its Manager and Chief Executive Officer

                                                                   _____
                                                                   Odelya Hoffman, an individual

# EXHIBIT 11

# UCC-1 FILED BY HOFFMANS





U220252425723



## STATE OF CALIFORNIA
*Office of the Secretary of State*
**UCC FINANCING STATEMENT (UCC 1)**
California Secretary of State
1500 11th Street
Sacramento, California 95814
(916) 653-3516

| For Office Use Only |
| --- |
| **-FILED-** |
| File No.: U220252425723 |
| Date Filed: 12/18/2022 |

Submitter Information:

Contact Name

Organization Name

Phone Number

Email Address

Address                                                      None

Debtor Information:

| Debtor Name | Mailing Address |
| --- | --- |
| Better Nutritionals, LLC | 3390 Horseless Carriage Drive<br>Norco, CA 92860 |

Secured Party Information:

| Secured Party Name | Mailing Address |
| --- | --- |
| Sharon Hoffman | 1930 Village Center Circle<br>#3-136<br>Las Vegas, NV 89134 |
| Odelya Hoffman | 1930 Village Center Circle<br>3-136<br>Las Vegas, NV 89134 |

Indicate how documentation of Collateral is provided:
Entered as Text

Description:
All assets of the Debtors now owned or hereafter acquired.

Indicate if Collateral is held in a Trust or is being administered by a Decedent's Personal Representative:
Not Applicable

Select an alternate Financing Statement type:
Not Applicable

Select an additional alternate Financing Statement type:
Not Applicable

Select an alternative Debtor/Secured Party designation for this Financing Statement:
Not Applicable

Optional Filer Reference Information:
BN-AI1

Miscellaneous Information:

Search to Reflect:

☐  Order a Search to Reflect

B1331-4665 12/18/2022 3:46 PM Received by California Secretary of State